**In the Matter of:**

*PETER (PANAGIOTI) TSOLKAS*

*vs*

*DEPUTY DALTON SUMNER*

---

*PETER TSOLKAS*

*October 02, 2024*

---



**2442 Atlantic Boulevard, Jacksonville, FL 32207**
**(904) 396-1050          www.firstcoastcr.com**

PETER (PANAGIOTI) TSOLKAS vs DEPUTY DALTON SUMNER
Tsolkas, Peter on 10/02/2024

```
 1              IN THE UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
 2                    JACKSONVILLE DIVISION

 3   PETER (PANAGIOTI) TSOLKAS,

 4             Plaintiff,

 5     vs.                        Case No. 3:23-cv-01428-WWB-PDB

 6   DEPUTY DALTON SUMNER,

 7             Defendant.
     _____
 8
                              DEPOSITION OF
 9                            PETER TSOLKAS

10        Deposition Taken on Behalf of Defendant

11     DATE:    Wednesday, October 2, 2024

12     TIME:    12:00 p.m. - 1:52 p.m.

13     PLACE:   First Coast Court Reporters
                2442 Atlantic Boulevard
14              Jacksonville, Florida  32207

15

16

17        Examination of the witness taken before:

18            Shannon M. Bishop, RDR, CRR, CRC
              Notary Public, State of Florida
19   _____

20             First Coast Court Reporters
                2442 Atlantic Boulevard
21             Jacksonville, Florida 32207
                    904-396-1050
22   _____

23

24

25
```

```
 1            A P P E A R A N C E S

 2

 3    JAMES M. SLATER, ESQUIRE

 4    Slater Legal PLLC
      113 South Monroe Street
 5    Tallahassee, Florida  32301

 6    appearing on behalf of the plaintiff.

 7

 8    MATTHEW J. CARSON, ESQUIRE

 9    Sniffen & Spellman, P.A.
      123 North Monroe Street
10    Tallahassee, Florida 32301

11    appearing on behalf of the Defendant.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2   WITNESS                              PAGE

 3   PETER TSOLKAS

 4   Direct Examination by Mr. Carson..........  5
     Cross-Examination by Mr. Slater.......... 43
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

PETER (PANAGIOTI) TSOLKAS vs DEPUTY DALTON SUMNER
Tsolkas, Peter on 10/02/2024                                          Page 4

```
 1                    E X H I B I T S

 2   EXHIBIT          DESCRIPTION                 PAGE

 3   No. 1            Judgment and Sentence        53

 4   No. 2            Plaintiff's Responses to
                      Defendant's First Request
 5                    for Admission                55

 6   No. 3            Plaintiff's Response to
                      Defendant's First Set of
 7                    Interrogatories              61

 8   No. 4            Plaintiff's Third
                      Amended Rule 26(1)(a)
 9                    Disclosures                  76

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

PETER (PANAGIOTI) TSOLKAS vs DEPUTY DALTON SUMNER
Tsolkas, Peter on 10/02/2024                                              Page 5

```
 1              S T I P U L A T I O N

 2        It was stipulated and agreed by and between

 3    counsel for the respective parties, and the

 4    witness, that the reading and signing of the

 5    deposition by the witness were reserved.

 6                      - - -

 7        STENOGRAPHIC COURT REPORTER:  Raise your

 8        right hand, please.

 9        Do you solemnly swear or affirm to tell

10        the truth, the whole truth, and nothing but

11        the truth, so help you God?

12        THE WITNESS:  I do.

13        STENOGRAPHIC COURT REPORTER:  Thank you.

14                    PETER TSOLKAS,

15    having been produced and first duly sworn as a

16    witness on behalf of the Defendant, testified as

17    follows:

18                  DIRECT EXAMINATION

19    BY MR. CARSON:

20        Q   Can you state your name for the record,

21    please.

22        A   Yes, Peter Tsolkas.  I go by Panagioti,

23    my Greek name.

24        Q   And your last name is spelled how?

25        A   T-s-o-l-k-a-s.
```

PETER (PANAGIOTI) TSOLKAS vs DEPUTY DALTON SUMNER
Tsolkas, Peter on 10/02/2024

Page 20

```
 1        Q    There was a -- some red paint that had
 2   been splattered on the road, correct?
 3        A    I have seen photos from that.
 4        Q    Do you know where that red paint came
 5   from?
 6        A    No.
 7        Q    Did you see anybody putting that red
 8   paint on the road?
 9        A    No.
10        Q    Did you hear anybody talking about red
11   paint being putting on the road -- being put on
12   the road?
13        A    No.
14        Q    Is it your understanding that somebody
15   with the protesting group put the red paint on
16   the road?
17        A    I do understand that.  That was -- yes,
18   that was explained in the news and --
19        Q    Do you know -- I'm sorry.  I didn't
20   meant to interrupt you.
21        A    I've seen the photos that you're
22   referring to, and the video.
23        Q    Do you know what that red paint is
24   supposed to symbolize?
25        A    No.
```

PETER (PANAGIOTI) TSOLKAS vs DEPUTY DALTON SUMNER
Tsolkas, Peter on 10/02/2024

1        Q    There's also a banner hung on the

2   archway over the entrance to the Florida State

3   Prison, correct?

4        A    Yes.

5        Q    Do you know who made that banner?

6        A    The banner that were -- there was

7   several banners at the protest.  You're talking

8   about the banner that hung above the road?

9        Q    Yes.

10       A    Yes.

11       Q    Who made that banner?

12       A    I participated in that.

13       Q    What did that banner say?

14       A    The banner said "Next Step."  It was in

15   quotations, a quote to Karen Smith.  It was a

16   memorial for -- the protest was also a memorial

17   of her death.  It was a quote of her's that said

18   "Next Step, We Burn it Down."

19       Q    And Karen Smith, you said it was a

20   memorial for her death?

21       A    Yes.

22       Q    How did she die?

23       A    She died in a car accident.

24       Q    And you and her were close, correct?

25       A    She was a friend of mine, yes.

```
1          A    No.
2          Q    Okay.  A number of noise-making devices
3     at the protest, correct?
4          A    Yes, a speaker and drums, and that sort
5     of -- yes.
6          Q    Do you know how many public address
7     speakers were at the protest?
8          A    No.
9          Q    Do you know how many drums?
10         A    No.
11         Q    You had a cymbal, correct?
12         A    A cymbal, yes.
13         Q    Do you know how many cymbals were there?
14         A    No.
15         Q    There were fireworks there?
16         A    I saw something like a -- what do you
17    call that sort of firework?  Like, a sparkler --
18    like, a ground sparkler, you know, the sort that
19    you light and -- fountain firework.
20         Q    Okay.  Do you know where those came
21    from?
22         A    I don't.
23         Q    Florida Prisoner Solidarity -- if I
24    misidentify that group, let me know, but it's
25    Florida Prisoner Solidarity, correct?
```

PETER (PANAGIOTI) TSOLKAS vs DEPUTY DALTON SUMNER
Tsolkas, Peter on 10/02/2024

```
 1        A    Yes.

 2        Q    Okay.  What's kind of their core belief,

 3   or beliefs?

 4             MR. SLATER:  Object to the form.

 5             You can answer.

 6        A    Oh, I understand that group to be

 7   concerned about the conditions of the prison

 8   system for prisoners, and also about the policy

 9   and a system that has used prisoners for free

10   labor, which occurs in Florida under contracts

11   with municipal and state government agencies, and

12   also private companies.

13        Q    Anything else?

14        A    I think that covers it.

15        Q    Okay.  When is the last time you watched

16   the video -- or a video of this event?

17        A    I don't recall.

18        Q    Within the past month?

19        A    Within the past several months, maybe a

20   year.  I don't recall a date.

21        Q    Okay.  You heard Deputy Sumner give

22   commands over his marked patrol unit PA system

23   that the protestors were ordered to leave the

24   premises within 30 seconds or they would be

25   arrested for trespass and their vehicles would be
```

PETER (PANAGIOTI) TSOLKAS vs DEPUTY DALTON SUMNER
Tsolkas, Peter on 10/02/2024

```
 1   towed, correct?

 2              MR. SLATER:  Object to the form.

 3         You can answer.

 4        A    I don't know exactly.  I don't have it

 5   memorized, but I know what you're referring to.

 6   I recall seeing in the video and hearing the

 7   announcement of something to that effect.

 8        Q    Do you remember -- on the day of the

 9   event, do you remember hearing an announcement --

10   an announcement over a PA that the protestors

11   were ordered to leave or they would be arrested

12   for trespass?

13        A    I remember a dispersal order of that

14   nature.

15        Q    Okay.  Do you remember there being a

16   time frame on how long the protestors would have

17   to leave before they would be arrested for

18   trespass?

19        A    No.

20        Q    Do you remember being told that if the

21   protestors did not leave that they would have

22   their -- they would be arrested and their

23   vehicles would be towed?

24        A    I remember hearing that in the video.

25   Again, I don't remember the exact phrase used,
```

PETER (PANAGIOTI) TSOLKAS vs DEPUTY DALTON SUMNER
Tsolkas, Peter on 10/02/2024

Page 32

1       A   I remember him saying, "Do you want to

2   talk shit?  You'll be arrested next," and then I

3   started to walk away towards the car to leave,

4   and then I felt my arms being grabbed and

5   handcuffed.

6       Q   Okay.  So you were stationary.  Deputy

7   Sumner said something about talking shit --

8       A   Right.

9       Q   -- and then you started moving?

10      A   Yes.

11      Q   Okay.  How long after that original

12  announcement where you were instructed to

13  disperse did what we just talked about take

14  place?

15      A   I don't know.  I think minutes.

16      Q   More than two minutes?

17      A   I don't -- two minutes sounds like an

18  estimation.

19      Q   Could it be more than four minutes?

20      A   It could be.

21      Q   More than five minutes?

22      A   I don't think so.

23      Q   When you heard that announcement, how

24  far away from your car were you, the announcement

25  to disperse?  How far away from your car were

1    you?

2         A    I was close to several cars.  I don't

3    remember where -- where in the lineup my car was.

4         Q    Were you within 100 feet of your car?

5         A    I don't remember, but probably.

6         Q    All right.  So Deputy Sumner says

7    something to the effect of, "Come here" -- "You

8    want to talk shit, come here," correct?

9         A    Yes.

10        Q    And then Deputy Sumner placed you under

11   arrest, correct?

12        A    Yes.

13        Q    Where was your wife and kids at this

14   time?

15        A    I don't know their exact location, in

16   the area.

17        Q    Talking with them since this incident,

18   do you know if they saw you be arrested?

19        A    I don't believe they saw me be arrested,

20   because I was between two cars, but I think they

21   were within the area to see that arrests were

22   occurring.

23        Q    Okay.  Deputy Sumner placed you in

24   handcuffs, correct?

25        A    Yes.

PETER (PANAGIOTI) TSOLKAS vs DEPUTY DALTON SUMNER
Tsolkas, Peter on 10/02/2024

Page 38

1   walking, you fucking pig," and kneeled.

2           What happened next?

3       A    Okay.   To elaborate on the -- where it

4   says "and kneeled," it's -- you know, I've been

5   to a lot of protests.   In fact, I've conducted

6   trainings on what to do if you're arrested.   And

7   I participated in those trainings and also

8   provided them.

9           And in my experience and my belief,

10  being arrested in what the moment I felt, and

11  continue to feel, was a wrongful arrest, that

12  going limp is a form of passive resistance that

13  ensures law enforcement that you're not -- not a

14  threat, because you're, in fact, not moving at

15  all.

16          So while I recognize there's going to be

17  some inconvenience to that, there's also some

18  safety and protections, that you're not

19  thrashing, you're not stiff or resisting.

20          So in my experience, usually at that

21  point I've been carried.   But in this case, when

22  I explained -- using some rough language, but I

23  explained with my words -- again, as a person who

24  respects the Constitution and the First

25  Amendment, that -- I used words.

1        And in response, I was thrown to the

2   ground and driven to the ground hard enough that

3   my shoulder was injured severely.

4        And so in that moment of indicating that

5   I was not walking, instead of being carried, I

6   was slammed to the ground, and with significant

7   force and intentional force on my shoulder, so

8   that I still have, you know, scars today from it.

9        And I felt it in direct response to

10  things I had said that Sumner appeared to be

11  offended by or upset by.  And that's why we're

12  here today.

13     Q   You said Deputy Sumner applied

14  intentional force on your shoulder?

15     A   Yes.

16     Q   How so?

17     A   In driving me to the ground and putting

18  enough weight on one specific shoulder that it

19  would be injured.

20     Q   He placed force on your shoulder?

21     A   Yes.

22     Q   What shoulder?

23     A   My left shoulder.

24     Q   How did he place force on your left

25  shoulder?

PETER (PANAGIOTI) TSOLKAS vs DEPUTY DALTON SUMNER
Tsolkas, Peter on 10/02/2024

1      Q    And your testimony is you fall on the

2    ground and then Deputy Sumner puts his weight on

3    you?

4      A    No, that he -- so he -- I think it was

5    that he was maybe -- you know, the feeling was

6    that when he heard that I said that I wasn't

7    going to walk with him, that he forced me to the

8    ground and -- and then dragged me from there.

9    The injury happened there.  And then I was

10   dragged off to the police car.

11     Q    Okay.  How was Deputy Sumner physically

12   controlling you at the time that you decided you

13   were no longer going to support your own body

14   weight?

15     A    I don't know.

16     Q    Okay.  What would you have liked him to

17   do when you decided that you weren't going to

18   support your own body weight?

19     A    I've been in this experience, as I

20   mentioned before, so I -- I guess what I

21   anticipated is it may have required more than one

22   person to then carry me, because I've also

23   carried people like this; that, you know, if you

24   want to arrest me for something that I feel like

25   I shouldn't be arrested for, well, then there's

PETER (PANAGIOTI) TSOLKAS vs DEPUTY DALTON SUMNER
Tsolkas, Peter on 10/02/2024

Page 46

```
1   the -- in my opinion, there's responsibility.
2   You can also carry me, because I'm not going to
3   physically engage on a -- kind of a spiritual or
4   principled level.
5           Does that make sense?
6       Q   Not really, but I appreciate you trying,
7   right?
8       A   I could have been put down.  I think --
9   I could have been put down without an injury
10  occurring.  I was in handcuffs.
11          And so it takes a particular amount of
12  force to get -- when someone clearly is not, you
13  know, capable to stop -- break their own fall
14  because they're in handcuffs.
15          So, you know, I could have been put down
16  and -- and waited there until there was enough
17  officers to carry me without having to struggle
18  too hard.
19          What would I have liked to have been
20  done?  I would very much have preferred not being
21  sent to the hospital.  And I think that that
22  would be the -- in that instance, you know, there
23  was other options besides pushing me to the
24  ground and injuring me.
25      Q   And I appreciate that.  When I asked you
```

```
 1   non-profit that organizes protests and deals with

 2   arrests.

 3          And so it's someone from the

 4   environmental protest movement, especially in

 5   cases where, you know, people are arrested and

 6   expecting, like, the possibility of an arrest.

 7   So I don't know who the individual was.

 8      Q    When you provided that training, did you

 9   kind of reiterate the training you received from

10   those folks?  Or did you have a different source

11   of information, a different curriculum, that sort

12   of thing?

13      A    A similar outline to, I think, the first

14   training I received.

15      Q    I was asking you some questions about

16   what was going on at the time, what you were

17   doing, what other people were doing, and you said

18   the scene was chaotic and that it was hard to

19   fully understand what was going on.

20          What did you mean by that?

21      A    That police were arresting people and it

22   was unclear how many people they were going to

23   try to arrest.

24      Q    Any other ways it was chaotic?

25      A    Mainly that.  Specifically that.
```

PETER (PANAGIOTI) TSOLKAS vs DEPUTY DALTON SUMNER
Tsolkas, Peter on 10/02/2024

1    Q    Were people yelling?

2    A    Yes.

3    Q    Were people yelling at law enforcement?

4    A    Yes.

5    Q    Were people getting in their cars and

6  leaving?

7    A    Yes.

8         (Exhibit 1 marked for identification.)

9  BY MR. CARSON:

10    Q    Mr. Tsolkas, I'm going to show you

11  what's been marked as Exhibit 1.  It's a one-page

12  document, Bates No. BCSO-Tsolkas 33.  Of course,

13  it would be the judgment and sentence in

14  Case No. 20MM1051.

15         Have you ever seen this document before?

16    A    Yes.

17    Q    Is that your signature at the bottom?

18    A    Yes.

19    Q    On the line marked "defendant"?

20    A    It is.

21    Q    And this is a document that references

22  what we spoke about earlier, correct, that you

23  pled nolo contendere to trespass after warning

24  and opposing an officer without violence.  Is

25  that correct?

PETER (PANAGIOTI) TSOLKAS vs DEPUTY DALTON SUMNER
Tsolkas, Peter on 10/02/2024

Page 60

```
 1            And so I don't -- I don't think I was
 2     intentionally dropping to my knees.  I think it
 3     was the process of one person trying to carry
 4     someone that they couldn't carry by themselves.
 5         Q    How much did you weigh at the time?
 6         A    Somewhere between 175, 180.
 7            Another reason for -- you know, for not
 8     walking, I think is that it makes it very clear
 9     that I'm also not running.  I'm not trying to
10     flee.  I'm not trying to evade the arrest.
11            So if that helps clarify at all why I
12     think it's not that I dropped to my knees, but
13     that I took a principled position of going limp
14     and unjust arrest.
15         Q    Yeah.  And earlier I think you called
16     it, what, passive resistance?
17            MR. SLATER:  Objection to form.
18         A    I believe that's how the complaint terms
19     it.
20         Q    You said you've been to a lot of
21     protests and in your experience going limp is
22     passive resistance.  Is that accurate?
23            MR. SLATER:  Object to the form.
24     BY MR. CARSON:
25         Q    Do you remember testifying to that?
```

PETER (PANAGIOTI) TSOLKAS vs DEPUTY DALTON SUMNER
Tsolkas, Peter on 10/02/2024                                                    Page 84

```
 1              Okay.  I'm just going to stop here.
 2    It's -- it's one second into the footage.  And I
 3    see here there's a sedan, and behind it there's a
 4    man wearing a hoodie.  Is that you?
 5         A    Yes.
 6         Q    And the man behind you, the officer, is
 7    that Deputy Sumner?
 8         A    I believe so, yes.
 9         Q    Okay.  I'm going to continue to play the
10    video.
11              Okay.  I'm going to pause here at
12    7 seconds in.  And we see that Deputy Sumner is
13    taking you away from that car, right?
14         A    Yes.
15         Q    Are you limp at this point?
16         A    Not at this point, no.
17         Q    No?  You're walking?
18         A    Yes.
19         Q    Okay.  And he walks you -- I'm going to
20    pause again here.  At about 10 seconds in, he
21    walks you to this -- what appears to be a truck,
22    the flatbed of a truck, right?
23         A    Yes.
24         Q    And at that point, about 10 seconds, I
25    see that your knees are bent.
```

PETER (PANAGIOTI) TSOLKAS vs DEPUTY DALTON SUMNER
Tsolkas, Peter on 10/02/2024

Page 92

```
 1                    CERTIFICATE OF OATH

 2

 3    STATE OF FLORIDA)
      COUNTY OF DUVAL )
 4

 5         I, Shannon M. Bishop, Court Reporter, Notary

 6    Public, State of Florida, certify that PETER

 7    TSOLKAS personally appeared before me on

 8    October 2, 2024, and was duly sworn.

 9

10         Witness my hand and official seal, October

11    11, 2024.

12

13                      Shannon M. Bishop

14                    _____

15                    Shannon M. Bishop, RDR, CRR, CRC

16                    Notary Public

17                    My Commission No. HH 127460

18                    Expires August 20, 2025

19                    Bonded Thru Budget Notary Services

20

21

22

23

24

25
```

PETER (PANAGIOTI) TSOLKAS vs DEPUTY DALTON SUMNER
Tsolkas, Peter on 10/02/2024

Page 93

```
 1              REPORTER'S CERTIFICATE

 2

    STATE OF FLORIDA)
 3  COUNTY OF DUVAL )

 4

 5         I, Shannon M. Bishop, Court Reporter and

 6  Notary Public, duly qualified in and for the

 7  State of Florida, do hereby certify that I was

 8  authorized to and did stenographically report the

 9  foregoing deposition; and that the transcript is

10  a true record of the testimony given by the

11  witness.

12      I further certify that I am not a relative,

13  employee, attorney or counsel of any of the

14  parties, nor am I a relative or employee of any

15  of the parties' attorney or counsel connected

16  with the action, nor am I financially interested

17  in the action.

18      Dated this 11th day of October, 2024.

19                    Shannon M. Bishop

20                    _____
                      Shannon M. Bishop, RDR, CRR, CRC
21

22

23

24

25
```