# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

**PETER (PANAGIOTI) TSOLKAS,**

    Plaintiff,

v.                                         Case No.: 3:23-cv-01428-WWB-PDB

**DEPUTY DALTON SUMNER,**

    Defendant.

_____/

## DEFENDANT'S MOTION TO EXCLUDE
## EXPERT TESTIMONY OF DR. JEREMY CUMMINGS

Defendant DEPUTY DALTON SUMNER ("Deputy Sumner"), through undersigned counsel, and pursuant to Rule 702, Federal Rules of Civil Procedure, moves this Honorable Court for an order excluding the opinions of Plaintiff's disclosed expert, Dr. Jeremy Cummings.

This case stems from Plaintiff's arrest during a protest at the Florida State Prison in Raiford, Florida on December 6, 2020. Deputy Sumner – then a Deputy with the Bradford County Sheriff's Office – arrested Plaintiff after he refused to comply with orders to disperse. As Deputy Sumner escorted Plaintiff to his patrol vehicle, Plaintiff decided to stop supporting his body weight with his legs in an act he describes as "passive resistance." Consequently, Plaintiff fell to the ground, and Deputy Sumner fell on top of him. Plaintiff injured his left shoulder as a result of the fall. The event was captured on Deputy Sumner's body-worn camera and on the cell phone of another protestor. Plaintiff's complaint brings excessive force and First Amendment retaliation claims under 42 U.S.C. § 1983, and an assault and battery claim under Florida law. ECF No. 1.

On September 2, 2024, Plaintiff served his expert disclosure and report pursuant to Rule 26(a)(2), Federal Rules of Civil Procedure. See Plaintiff's Designation of Experts and Disclosure of Expert Testimony, attached hereto as Exhibit 1 (hereinafter "Report"). Plaintiff has retained Dr. Jeremy Cummings as an expert in this matter.

As discussed in more detail below, Dr. Cummings' opinions should be excluded in their entirety. The report does not contain any analysis or reasoning to support Dr. Cummings' conclusions or opinions, nor does the report explain the data or information used in forming the same. Dr. Cummings' opinions are unreliable, are based on unreliable data, will not assist the trier of fact, and are otherwise inadmissible under the standards established by Rule 702, as well as the Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). Dr. Cummings' opinions should not be considered on summary judgment, nor should Dr. Cummings be permitted to testify at trial. The Court should fulfill its "gatekeeper" duty and exclude Dr. Cummings' opinion from evidence. *U.S. v. Frazier*, 387 F. 3d 1244, 1260 (11th Cir. 2004) (*en banc*) ("The importance *Daubert*'s gatekeeping requirement cannot be overstated.").

## **PLAINTIFF'S EXPERT'S OPINIONS**

In his report, Dr. Cummings provides the following opinions:

1. It is observable from the video evidence that Deputy Sumner's left knee, both arms, and a portion of his body weight (~220 pounds) struck the rear of Mr. Peter Tsolkas' body as Mr. Tsolkas fell to the ground.

2. Calculations were performed using an anthropomorphic test device (ATD) scaled to Mr. Peter Tsolkas' sex, height, weight, and age. The impact forces calculated to be acting on the ATD's left shoulder with an additional ATD scaled to Deputy Sumner's stature was around 395 Newtons (N).

2

3. The loading on the ATD's left shoulder without the deputy landing on the backside of Mr. Tsolkas was around 324 N. This is approximately a 21.8% decrease in force relative to the officer not (sic) striking the rear of Mr. Tsolkas.

Report, p. 4.

## **MEMORANDUM OF LAW**

### I.  **Legal Standard**

The admissibility of an expert's opinion testimony is governed by Rule 702, Federal Rules of Evidence. Rule 702 was amended in response to the Supreme Court's decisions in *Daubert* and *Kumho Tire*.

Rule 702 provides as follows:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Eleventh Circuit requires trial courts acting as gatekeepers to engage in a "rigorous three-part inquiry" assessing whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or

to determine a fact in issue. *Frazier*, 387 F.3d at 1260 (citations omitted). "While there is inevitably some overlap among the basic requirements – qualification, reliability, and helpfulness – they remain distinct concepts and the courts must take care not to conflate them." *Id*.

The burden of satisfying these three elements falls upon the party *proffering* the expert witness, and not the party seeking the witness's exclusion. *See, e.g., Rink v. Cheminova*, 400 F.3d 1286, 1292 (11th Cir. 2005) ("The party offering the expert has the burden of satisfying each of these three elements by a preponderance of the evidence.") (*citing Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999)).

Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., Fla.,* 402 F.3d 1092, 1111 (*citing Michigan Millers Mut. Ins. Corp. v. Benfield*, 140 F.3d 915, 921 (11th Cir. 1998) (quotations omitted)). "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id*. (*quoting Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Thus, a trial court may exclude expert testimony that is "imprecise and unspecific," or whose factual basis is not adequately explained. *Id*. (*citing Frazier*, 387 F.3d at 1266). An "imprecise and unspecific" expert opinion does not assist the jury; rather, an "imprecise opinion easily could serve to confuse the jury and might well [mislead] it." *Frazier*, 387 F.3d at 1266.

### Qualification

Rule 702 requires a rigorous inquiry to determine whether the expert is qualified to testify competently regarding the matters he intends to address. *Rink*, 400 F.3d at

1291-92 (*quoting City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). "[W]hile an expert's overwhelming qualifications may bear on the reliability of his proffered testimony, they are by no means a guarantor of reliability…. [O]ur caselaw plainly establishes that one may be considered an expert but still offer unreliable testimony." *Frazier*, 387 F.3d at 1261 (*quoting Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341-42 (11th Cir. 2003)).

### **Reliability**

The district court has "substantial discretion in deciding how to test an expert's reliability and whether the expert's relevant testimony is reliable." *United States v. Majors*, 196 F.3d 1206, 1215 (11th Cir. 1999) (citation and quotation omitted). "[T]he proponent of the testimony does not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence, it is reliable." *McGhan Med. Corp.*, 184 F.3d at 1312 (citation omitted). Thus, the inquiry into reliability must focus on "principles and methodology" and not the expert witness's conclusions. *Daubert*, 509 U.S. at 595. While an expert's qualifications may bear on the reliability of his proffered testimony, qualifications alone do not guarantee reliability. *Frazier,* 387 F.3d at 1261 (citation omitted). Because "one may be considered an expert but still offer unreliable testimony," it remains a basic foundation for admissibility under Rule 702 and *Daubert* that proposed expert testimony must be based on "good grounds." *Id*.

The reliability-related factors that *Daubert* contemplates include "whether the theory can and has been tested," "whether it has been subjected to peer review," "the known or expected rate of error," and "whether the theory and methodology employed is generally accepted in the relevant scientific community." *McClain v. Metabolife Int'l,*

5

*Inc.*, 401 F.3d 1233, 1251 (11th Cir. 2005) (*citing Daubert*, 509 U.S. at 593–94). To the extent an expert would rely primarily on his experience, he must then "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Frazier*, 387 F.3d at 1261 (*quoting* Fed. R. Evid. 702 advisory committee note to 2000 amendments). The trial court's gatekeeping function requires more than simply "'taking the expert's word for it.'" Fed. R. Evid. 702 advisory committee's note to 2000 amendments; *see also Daubert* (on remand), 43 F.3d 1311, 1316 (9th Cir. 1995) (observing that the gatekeeping role requires a district court to make a reliability inquiry, and that "the expert's bald assurance of validity is not enough"). "If admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong." *Frazier*, 387 F.3d at 1261.

### Helpfulness

The third part of the inquiry courts must engage in to assess the admissibility of expert testimony is whether the testimony will assist the trier of fact. *Id.* at 1262. In evaluating this factor, expert testimony is admissible "if it concerns matters that are beyond the understanding of the average lay person." *Id.* (*citing United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985) (expert testimony is admissible if it offers something "beyond the understanding and experience of the average citizen"). "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Id.* at 1262-63 (*citing 4 Weinstein's Federal Evidence* § 702.03[2] [a]).

**II.      Legal Argument**

Plaintiff served his expert disclosure and report on September 2, 2024. Dr. Cummings has not amended or supplemented his disclosure or report.

Substantively, the Report contains the following sections:

II. CONCLUSIONS

III. DISCUSSION

IV. FIGURES

V. INFORMATION REVIEWED

The "Conclusions" section comprises 126 words. (Report, p. 4).

The "Discussion" section comprises 153 words. (Report, p. 5). The section also contains an image and "still frame" screen captures that are likely taken from one of the cell phone videos that Dr. Cummings purports to have reviewed. (Report, pp. 6-7, 12). Each image contains commentary of unknown basis or origin. No image contains a time stamp.

The "Figures" section contains two "Michelin Man" drawings and "computed body dimensions" of unknown origin (Report, pp. 8, 11), along with two drawings that have been sparsely (and unhelpfully) described as "Sequence during MADYMO physics simulation" (Report, pp. 9-10).

Not including the descriptions of the images and figures, the substance of Dr. Cummings' report consists of just 279 words. Dr. Cummings asserts that he used a "physics simulation program MADYMO (MAthematical DYnamic MOdels) … to reconstruct the biomechanical forces, accelerations, velocities, and displacements that occurred to anthropomorphic test devices (ATD) surrogate to represent Mr. Tsolkas…"

7

(Report, p. 5), but provides no explanation of how these "forces, accelerations, velocities, and displacements" were calculated.

For the reasons stated in more detail below, Dr. Cummings' barebones Report is nothing more than unsupported, unreliable, *ipse dixit* that is not helpful to the trier of fact. Therefore, Dr. Cummings' Report and testimony concerning the issues in this litigation should be excluded in their entirety.

### A. Dr. Cummings Is Not Qualified

Dr. Cummings is a two-time graduate of the University of North Carolina at Chapel Hill. (Report, p. 14). He holds a Ph.D. in biomedical engineering and a B.S. in applied and materials science with minors in physics and chemistry. Id. He has experience in analyzing "accidents involving the nature of human injury, injury causation, visibility analysis, and analysis of injury severity consistent with the physics of the accident situation." Id. On the surface, it would seem that Dr. Cummings might be qualified to provide some expert opinions in certain types of cases. What the Report fails to show, however, is that Dr. Cummings is qualified to provide the opinions he presents in the Report in *this* case.

Here, Dr. Cummings states he used an unspecified MADYMO physics simulation program to calculate forces acting on Plaintiff's left shoulder during a fall that followed his arrest. Report, p. 5. The Report does not provide any basis for this Court to determine that a MADYMO physics simulation program is generally accepted for calculating forces in this type of scenario,[1] or at all.

---

[1] See, Report, p. 13 (VI. References, 11. Siemens. (2024) Simcenter Madymo Reference Manual Version 2406 (pp. 1-1109)); see also https://plm.sw.siemens.com/en-

Regarding the numbers used for calculations, Dr. Cummings appears to use the height and weight self-reported by Deputy Sumner in his July 21, 2017, application to be a Deputy Sheriff with the Bradford County Sheriff's Office. Report, pp. 11, 12; see also Deputy Sumner's LE Application (excerpts), attached hereto as Exhibit 2.

With nothing more than Deputy Sumner's sex, height, weight, and age,[2] Dr. Cummings provides a number of "computed body dimensions." Report, p. 8. The Report provides no explanation for how these dimensions were calculated.[3] Dr. Cummings does not explain why or how he chose the specific anthropomorphic test devices[4] he did.[5] He does not explain how the calculated body dimensions were used in the MADYMO physics simulation program, or how a variance between the calculated body dimensions and the actual body dimensions of Plaintiff and/or Deputy Sumner would change the results of the program's force calculations.

Dr. Cummings also appears to use the height and weight "Stated/Reported" in Plaintiff's medical records. Report, pp. 8, 12; see also Medical Records for Peter Tsolkas

---

US/simcenter/mechanical-simulation/madymo/ (last visited December 2, 2024) ("Why Simcenter Madymo? Occupant and pedestrian safety are critical design aspects of transportation vehicles like cars and airplanes, but physical crash tests are expensive and take time. Simcenter Madymo simulates occupant safety so you can develop better occupant and pedestrian safety solutions faster.").

[2] The information reviewed by Dr. Cummings does not appear to include Deputy Sumner's date of birth. It is not clear from where Dr. Cummings' divined Deputy Sumner's age.

[3] Dr. Cummings does not represent that any of these dimensions were actually measured at the time of the incident or, for that matter, at any time.

[4] Otherwise known as crash dummies. *See, e.g., McHale v. Crown Equip. Corp.*, No. 21-14005, 2022 WL 4350702, at *2 (11th Cir. Sept. 20, 2022).

[5] 5 foot, 6 inch tall men who weigh 180.4 pounds can come in many shapes and sizes. For example, not all such men will necessarily have a 15.52 inch neck circumference or a 13.15 inch bicep circumference. Dr. Cummings provides no support for why he chose these specific models.

(excerpts), attached hereto as Exhibit 3.[6]

Even though Dr. Cummings provides no explanation for how he or the MADYMO physics simulation program calculates force, those who remember middle school science class will recall Newton's second law of motion, which defines force as mass times acceleration, with acceleration being the change in velocity with respect to time.[7] This can also be seen in the unit of force that Dr. Cummings uses to quantify force, Newton (N), which is defined as the force required to impart an acceleration of one meter per second per second to a mass of one kilogram.[8]

So, if "force" requires a calculation of time, and a "Newton" specifically calls for the change of velocity per second, where is this calculation in the Report? It's not there.

The only references to time in the Report are the faint time stamps in the upper right-hand corners of Figures 2 and 3 from the MADYMO physics simulation. Figure 2 purports to be "0 ms," and Figure 3 purports to be "250 ms." Moreover, Figure 2 appears to be the MADYMO corollary to Image 3 (taken from a cell phone video), and Figure 3 appears to be the MADYMO corollary to Image 4 (also taken from a cell phone video). It can be inferred that the cell phone video is the only possible source of the time data that could have been used in these force calculations.

Because the Report contains no explanation as to how force was calculated, the

---

[6] In his medical records, Plaintiff's weight is "Stated/Reported" as "81.818" kilograms. It goes without saying that 81.818 kilograms is an oddly specific weight to self-report. Even if converting from pounds, Plaintiff would have had to report that he weighed 180.377814 pounds. Nonetheless, Dr. Cummings found the data reliable enough for his purposes.

[7] See, e.g., https://www1.grc.nasa.gov/beginners-guide-to-aeronautics/newtons-laws-of-motion/#newtons-second-law-force (last visited December 2, 2024).

[8] See, e.g., https://www.merriam-webster.com/dictionary/newton (last visited December 2, 2024).

Report can – and should – be excluded. However, having gone through the exercise of identifying data points and their source, it is now clear that Dr. Cummings used a methodology that falls outside his expertise – namely, using video files to supply time data. Dr. Cummings' opinions should be excluded for this additional reason. In other words, even if the data used by Dr. Cummings was reliable (it wasn't), or the methodology used by Dr. Cummings was reliable (it wasn't), he still is not qualified to provide an expert opinion because he is not qualified to do the sort of work that he purported to do.

Dr. Cummings had a similar opinion excluded in 2018. *See Patel v. City of Madison, Alabama*, No. 5:15-CV-0253-VEH, 2018 WL 1876356 (N.D. Ala. Apr. 19, 2018). There, the Court exercised its role as a gatekeeper and held that "Dr. Cummings may be an expert in some areas, but he is not an expert in the photogrammetry of a video system he does not adequately understand." *Id*. at *6.

In *Patel*, Dr. Cummings took measurements from still photographs captured from videos from a law enforcement officer's patrol vehicle to calculate the velocity at which the plaintiff hit the ground. *Id.* at *5. In his deposition in *Patel*, Dr. Cummings denied knowing about any "peer-reviewed scientific publications that support using a compressed digital video image ... to compare the speed of a falling person versus what happened to Mr. Patel[.]" *Id*. The Court also noted that Dr. Cummings admitted to having no forensic video analysis certifications, though he claims that the photogrammetry coursework is applicable to videos. *Id.* (quotations omitted).

Here, Dr. Cummings's curriculum vitae contains the same language as his resume in *Patel*. Compare Report, p. 15 to *Patel*, 2018 WL 1876356 *4, fn 4. Dr. Cummings does not appear to now possess one or more forensic video analysis certification(s) that he

11

lacked in *Patel*. By all accounts, it appears Dr. Cummings is no more qualified to provide an expert opinion based on still photographs taken on an unknown cell phone and saved in an unknown video format than he was in *Patel*. Because he is not qualified, his opinions should be excluded in their entirety.

### B. Dr. Cummings' Opinions are Unreliable

Because force calculations are inherently based on measurements of mass and time, Plaintiff has the burden of establishing that the data measurements used in his expert's calculations were reliable. Plaintiff also shoulders the burden of establishing that his expert's methodology was reliable. Plaintiff failed to satisfy either burden.

First, as referenced above, Dr. Cummings based Deputy Sumner's "computed body dimensions" on the height and weight Deputy Sumner self-reported on a job application dated July 21, 2017 – more than 3 years prior to the subject incident. Dr. Cummings did not identify his source for Deputy Sumner's age. Dr. Cummings also based Plaintiff's "computed body dimensions" on the height and weight Plaintiff may have reported to medical providers following the incident – although, as stated above, it seems unlikely that Plaintiff "Stated/Reported" his weight as "81.818 kilograms" or "180.377814 pounds." Inasmuch as "force" calculations require accurate measurements of mass, Dr. Cummings is not off to a great start.

The reliability of the Report is further hampered by the fact that there is no explanation of how the MADYMO physics simulation program computes body dimensions. Is there an option for strength or fitness? Certainly, there is a physical difference between a 180-pound running back and the average man of the same height and weight. Does the MADYMO physics simulation program provide "average" body

12

dimensions based on sex, height, weight, and age without any adjustment for the person's actual dimensions? Are they assumptions rather than actual measurements? Dr. Cummings doesn't say.

Nor is there any explanation of how the MADYMO physics simulation program calculates force. Presumably the program required additional data beyond the sex, height, weight, and age of Plaintiff and Deputy Sumner. For example, the two men standing next to each other and not moving would not result in any force being delivered in any direction. Did someone tell the program that at some point Plaintiff fell and Deputy Sumner fell on top of him? Did someone tell the program that Deputy Sumner's left knee impacted the back of Plaintiff's right hamstring, or that Deputy Sumner's hands impacted the right side of Plaintiff's lower back? Did someone tell the program when in the course of falling that impact occurred? If so, what values were entered into the program, and how were they measured? Dr. Cummings doesn't say.

But even more fatal to the reliability of Dr. Cummings' opinions is the wholly unreliable calculation of time. Perhaps the faint time stamps in the upper right-hand corners of Figures 2 and 3 were meant to reflect measurements of time. This is not clear from the Report. Moreover, nowhere in the brief Report does Dr. Cummings provide any assurance that the video from which he gleaned these data had not been tampered with, or that the time data provided by the video file is precise, accurate, or otherwise reliable for these calculations. Dr. Cummings does not provide any explanation regarding the frame rate or encoding rate of the video, or otherwise provide any guarantee that the timing of the video is reliable. As was the case in *Patel*, "Dr. Cummings's opinion is not based on any reliable methodology." *Patel*, 2018 WL 1876356 *7. As discussed above,

he remains unqualified to do this sort of forensic analysis. Moreover, his analysis is flawed because he used a video that he has not established is reliable to provide time data. *See, e.g., Patel*, 2018 WL 1876356 *7, fn 7.

Additionally, Dr. Cummings' opinions must be excluded because he has not provided the underlying calculations. Put simply, Dr. Cummings has wholly failed to "show his work." "The need for an expert to complete and explain his methodology is at the heart of reliability." *Lee-Bolton v. Koppers Inc.*, 319 F.R.D. 346, 378 (N.D. Fla. 2017). A trial court may exclude expert testimony that is "imprecise and unspecific," or whose factual basis is not adequately explained. *Cook*, 402 F.3d at 1111 (*citing Frazier,* 387 F.3d at 1266). This Court should exclude Dr. Cummings' expert testimony here.

Finally, there is the issue of the "opinions" Dr. Cummings inserted into the commentaries included with Images 3 and 4. Report, p. 7. There, Dr. Cummings asserted that Deputy Sumner's left knee was "placed on the backside of [Plaintiff] prior to [Plaintiff] striking the ground…" and that "[p]rior to impact with the ground, the deputy extends his left and right arms onto the upper torso of Mr. Tsolkas increasing the impact forces on Mr. Tsolkas' upper body, and left shoulder as Mr. Tsolkas strikes the ground." Nearly every portion of these statements is demonstrably false.

As it relates to Image 3, there is no basis for Dr. Cummings' assertion that Deputy Sumner's "left knee was "placed on the backside of [Plaintiff]…" Footage from Deputy Sumner's body-worn camera (which Dr. Cummings claims to have reviewed) shows Deputy Sumner falling with Plaintiff, at which time Deputy Sumner's left knee contacted Plaintiff's right hamstring.



Deputy Sumner's Body-worn Camera Footage, ECF No. 22-4, 6:56



ECF No. 22-4, 6:57

      Did Dr. Cummings tell the MADYMO physics simulation program that Deputy Sumner placed his left knee on Plaintiff's backside prior to Plaintiff striking the ground? Was that data point important to the program's force calculation? We have no way of

15

knowing, as Dr. Cummings did not share that information in his Report.

As it relates to Image 4, the still frame referenced does not support that it reflects the body positions of Plaintiff or Deputy Sumner "prior to impact with the ground." Neither does any other known video of the subject incident.

Moreover, Dr. Cummings provides no basis for his bald assertion that Deputy Sumner "extend[ed] his left and right arms … increasing the impact forces on [Plaintiff's] … left shoulder as [Plaintiff] strikes the ground." With fixed mass, increasing forces necessarily requires positive acceleration, which requires a calculation of a change in velocity over time. As with the rest of the Report, Dr. Cummings says "it is so," but provides no basis, support, calculation, or explanation.

But perhaps most problematic is Dr. Cummings' suggestion that Deputy Sumner "extend[ed] his left and right arms onto [Plaintiff's] upper torso…" The best available video footage (which is certainly better than the source video for Image 4) shows that Deputy Sumner's left and right hands were both under Plaintiff's arms and only contacted the right side of his lower back, and never to his upper torso.



ECF No. 22-4, 6:57

Did Dr. Cummings tell the MADYMO physics simulation program that Deputy Sumner "extend[ed] his left and right arms onto [Plaintiff's] upper torso…"? Figure 3 (Report, p. 10) would suggest he did. Of course, we have no way of knowing, as Dr. Cummings did not share that information in his Report.

Read together, we have an exceedingly brief report that concludes that Deputy Sumner increased the impact forces on Plaintiff's left shoulder (see Conclusion No. 2, Report, p. 4), based on a physics simulation for which we do not have the input data or calculations, and which appears may be based on incorrect force vectors and application points.

To the extent the captions in Images 3 and 4 comprise "opinions" or "conclusions," they, too, must be excluded. Because they are additional examples of faulty and unreliable data being used in an unreliable methodology, they further justify exclusion of the Report as a whole.

### C.  Dr. Cummings' Opinions are Unhelpful

As discussed above, Dr. Cummings is not qualified to provide the mathematical or scientific calculations on pages 4 and 5 of the Report, nor are those calculations reliable. Even if they were reliable, they would not be helpful to the trier of fact.

First, Dr. Cummings provides a range of calculated forces. According to the Report, with Deputy Sumner falling on top of Plaintiff as Plaintiff fell, the calculated forces acting on the left shoulder ranged between 320 N and 469 N. Report, p. 5. Without Deputy Sumner falling on top of Plaintiff as Plaintiff fell, the calculated forces acting on the left shoulder ranged between 226 N and 422 N. There is considerable overlap in those two ranges. According to Dr. Cummings' calculations, it is possible that the impact to Plaintiff's left shoulder could have been **as high or higher** without Deputy Sumner falling on him than with Deputy Sumner falling on him. Dr. Cummings provides no information regarding why there exists such wide ranges of calculated forces, why they overlap, or how they were calculated. That information certainly does not help the trier of fact.

With those unreliable calculations properly excluded, the remainder of Dr. Cummings' Report is not helpful. Dr. Cummings' very first conclusion is that

> It is observable from the video evidence that Deputy Sumner's left knee, both arms, and a portion of his body weight (~220 pounds) struck the rear of Mr. Peter Tsolkas' body as Mr. Tsolkas fell to the ground.

Report, p. 4.

The jury is capable of observing the video evidence and does not need an expert to tell them what is shows. Any such opinion from an expert is just bolstering what

Plaintiff's counsel can be expected to say in opening argument or closing statement and is improper.

Dr. Cummings also opined that "[t]he increased force from the officer acting[9] on Mr. Tsolkas will increase Mr. Tsolkas' injury likelihood and also increase the injury depth of penetration." Report, p. 5. That sort of observation is not outside the understanding of the average lay juror who is as capable of viewing the available videos as Dr. Cummings (and perhaps even more so) and determining if and to what extent Deputy Sumner's weight falling on Plaintiff contributed to his injury. Considering the unreliability of Dr. Cummings' calculations, this sort of opinion is just an expert bolstering expected argument.

## **CONCLUSION**

Plaintiff did not carry his burden of establishing that Dr. Cummings is qualified to make the opinions contained his Report. Further, the data upon which Dr. Cummings rely, and his methodology, are unreliable. Finally, Dr. Cummings' opinions will not assist the trier of fact. Accordingly, the Court should execute its "gatekeeping" function and exclude the expert testimony referenced herein in its entirety.

## **LOCAL RULE 3.01(g) CERTIFICATION**

Pursuant to Local Rule 3.01(g), undersigned counsel hereby certifies that between November 30 and December 2, 2024, a good faith conference was held with Plaintiff's Counsel, Mr. James M. Slater, via electronic mail, with respect to the relief requested herein, and undersigned counsel is authorized to represent that Plaintiff opposes the motion.

---

[9] Dr. Cummings does not specify what "acting" means.

19

Dated this 3rd day of December, 2024.

                              Respectfully submitted,

                              */s/ Matthew J. Carson*
                              **MATTHEW J. CARSON**
                              Florida Bar No. 0827711
                              E-mail: mcarson@sniffenlaw.com
                              **MICHAEL P. SPELLMAN (Lead Counsel)**
                              Florida Bar No. 937975
                              E-mail: mspellman@sniffenlaw.com

                              **SNIFFEN & SPELLMAN, P.A.**
                              123 North Monroe Street
                              Tallahassee, Florida 32301
                              Telephone: (850) 205-1996
                              Facsimile: (850) 205-3004
                              *Attorney for Defendant*

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 3rd day of December, 2024, a true and correct copy of the foregoing was electronically filed in the U.S. District Court, Middle District of Florida, Jacksonville Division using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

                              */s/ Matthew J. Carson*
                              **MATTHEW J. CARSON**