**In the Matter of:**

*PETER (PANAGIOTI) TSOLKAS*

*vs*

*DEPUTY DALTON SUMNER*

---

*PETER TSOLKAS*

*October 02, 2024*

---



**2442 Atlantic Boulevard, Jacksonville, FL 32207**
**(904) 396-1050          www.firstcoastcr.com**

PETER (PANAGIOTI) TSOLKAS vs DEPUTY DALTON SUMNER
Tsolkas, Peter on 10/02/2024

```
 1              IN THE UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
 2                    JACKSONVILLE DIVISION

 3    PETER (PANAGIOTI) TSOLKAS,

 4              Plaintiff,

 5      vs.                        Case No. 3:23-cv-01428-WWB-PDB

 6    DEPUTY DALTON SUMNER,

 7              Defendant.
      _____
 8
                             DEPOSITION OF
 9                           PETER TSOLKAS

10        Deposition Taken on Behalf of Defendant

11    DATE:    Wednesday, October 2, 2024

12    TIME:    12:00 p.m. - 1:52 p.m.

13    PLACE:   First Coast Court Reporters
                2442 Atlantic Boulevard
14              Jacksonville, Florida  32207

15


16
             Examination of the witness taken before:
17
                 Shannon M. Bishop, RDR, CRR, CRC
18               Notary Public, State of Florida
      _____
19
                 First Coast Court Reporters
20                 2442 Atlantic Boulevard
                  Jacksonville, Florida 32207
21                    904-396-1050
      _____
22

23

24

25
```

```
 1              A P P E A R A N C E S

 2

 3   JAMES M. SLATER, ESQUIRE

 4   Slater Legal PLLC
     113 South Monroe Street
 5   Tallahassee, Florida  32301

 6   appearing on behalf of the plaintiff.

 7

 8   MATTHEW J. CARSON, ESQUIRE

 9   Sniffen & Spellman, P.A.
     123 North Monroe Street
10   Tallahassee, Florida 32301

11   appearing on behalf of the Defendant.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

PETER (PANAGIOTI) TSOLKAS vs DEPUTY DALTON SUMNER
Tsolkas, Peter on 10/02/2024                                                    Page 3

1                          I N D E X

2    WITNESS                                          PAGE

3    PETER TSOLKAS

4    Direct Examination by Mr. Carson..........  5
     Cross-Examination by Mr. Slater.......... 43
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PETER (PANAGIOTI) TSOLKAS vs DEPUTY DALTON SUMNER
Tsolkas, Peter on 10/02/2024                                                              Page 4

```
 1                    E X H I B I T S

 2    EXHIBIT           DESCRIPTION                 PAGE

 3    No. 1             Judgment and Sentence          53

 4    No. 2             Plaintiff's Responses to
                        Defendant's First Request
 5                      for Admission                  55

 6    No. 3             Plaintiff's Response to
                        Defendant's First Set of
 7                      Interrogatories                61

 8    No. 4             Plaintiff's Third
                        Amended Rule 26(1)(a)
 9                      Disclosures                    76

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  S T I P U L A T I O N

 2        It was stipulated and agreed by and between

 3    counsel for the respective parties, and the

 4    witness, that the reading and signing of the

 5    deposition by the witness were reserved.

 6                       - - -

 7        STENOGRAPHIC COURT REPORTER:  Raise your

 8        right hand, please.

 9           Do you solemnly swear or affirm to tell

10        the truth, the whole truth, and nothing but

11        the truth, so help you God?

12           THE WITNESS:  I do.

13        STENOGRAPHIC COURT REPORTER:  Thank you.

14                   PETER TSOLKAS,

15    having been produced and first duly sworn as a

16    witness on behalf of the Defendant, testified as

17    follows:

18                   DIRECT EXAMINATION

19    BY MR. CARSON:

20        Q   Can you state your name for the record,

21    please.

22        A   Yes, Peter Tsolkas.  I go by Panagioti,

23    my Greek name.

24        Q   And your last name is spelled how?

25        A   T-s-o-l-k-a-s.
```

1      Q    What did she do?

2      A    She does work for Service Employee

3  International Union, in their HR department.

4      Q    Does she still do that work?

5      A    Yes.

6      Q    And where are they located?

7      A    I don't know where the national office

8  is.  She does work -- it's remote, so she works

9  from home, works remotely.

10      Q    All right.  So on December 6, 2020, you

11  participated in a protest outside the prison, the

12  Florida State Prison at Raiford, Florida,

13  correct?

14      A    Yes.

15      Q    What was the purpose of the protest?

16      A    The conditions in the Florida State

17  Prison, so a number of conditions issues that

18  have been raised by prisoners and people with

19  family members in prison.

20      Q    Like what?

21      A    The use of strip-cell torture;

22  basically, forcing people to cells with -- that

23  were, especially in the winter, very cold, and

24  people were not allowed to even have clothes or a

25  blanket.  That's one report we had gotten.  And

1    other instances of injury or death that --

2    between prison guards and prisoners.

3              So I don't -- I don't recall, you know,

4    every incident, but generally conditions of

5    confinement.

6         Q    How many people were at this protest?

7         A    I don't remember.  I would be

8    estimating.

9         Q    Sure.

10        A    Maybe there was 40 or so.

11        Q    Your wife was there, correct?

12        A    Yes.

13        Q    Your children were there, correct?

14        A    Yes.

15        Q    Did they come there with you?

16        A    Yeah.  I think we drove in separate

17   cars, but we went together.  Or maybe we drove

18   together.  I can't -- I don't recall the drive

19   over.

20        Q    We've all seen the videos.  You've seen

21   the videos that were taken, correct?

22        A    Yes.

23        Q    Have you watched all the videos that you

24   have?

25        A    Yes.

1      Q    There was a -- some red paint that had

2   been splattered on the road, correct?

3      A    I have seen photos from that.

4      Q    Do you know where that red paint came

5   from?

6      A    No.

7      Q    Did you see anybody putting that red

8   paint on the road?

9      A    No.

10     Q    Did you hear anybody talking about red

11  paint being putting on the road -- being put on

12  the road?

13     A    No.

14     Q    Is it your understanding that somebody

15  with the protesting group put the red paint on

16  the road?

17     A    I do understand that.  That was -- yes,

18  that was explained in the news and --

19     Q    Do you know -- I'm sorry.  I didn't

20  meant to interrupt you.

21     A    I've seen the photos that you're

22  referring to, and the video.

23     Q    Do you know what that red paint is

24  supposed to symbolize?

25     A    No.

1        Q    There's also a banner hung on the

2    archway over the entrance to the Florida State

3    Prison, correct?

4        A    Yes.

5        Q    Do you know who made that banner?

6        A    The banner that were -- there was

7    several banners at the protest.  You're talking

8    about the banner that hung above the road?

9        Q    Yes.

10       A    Yes.

11       Q    Who made that banner?

12       A    I participated in that.

13       Q    What did that banner say?

14       A    The banner said "Next Step."  It was in

15   quotations, a quote to Karen Smith.  It was a

16   memorial for -- the protest was also a memorial

17   of her death.  It was a quote of her's that said

18   "Next Step, We Burn it Down."

19       Q    And Karen Smith, you said it was a

20   memorial for her death?

21       A    Yes.

22       Q    How did she die?

23       A    She died in a car accident.

24       Q    And you and her were close, correct?

25       A    She was a friend of mine, yes.

1    Q    Her death had nothing to do with her

2  being detained or incarcerated, correct?

3    A    Her -- no.

4    Q    That's not correct?

5    A    Her death did not have anything to do

6  with her being detained or incarcerated.

7    Q    But the -- the work that you and the

8  Florida Solidarity -- Florida Prisoner

9  Solidarity, is that work that was near and dear

10  to her heart?

11    A    Yes.

12    Q    Okay.  So the protest is partially to

13  protest the -- what had been reported as the

14  conditions of the -- conditions of confinement in

15  the prison, but also a memorial to Ms. Smith's

16  life's work?

17    A    Yes.

18    Q    Okay.  What does "Next Step, We Burn it

19  Down" mean?

20        MR. SLATER:  Object to the form.

21        You can answer.

22    A    It's a reference to the -- for the

23  system of slavery that previously existed in

24  this -- in the South and continued under Jim Crow

25  laws that -- so it's a reference to opposing and

1  resisting slavery, in that the prison system is a

2  form of modern-day slavery, where people are

3  forced to work without pay.

4       Q   Okay.  Who is "we"?

5       A   I don't understand.

6       Q   It says "Next Step, We Burn it Down."

7  Who is "we"?

8       A   I think it's a -- I don't know what

9  Karen meant, but a vague kind of metaphor, I

10 guess, like as a society that objects to slavery.

11      Q   Okay.  And "We Burn it Down," what is

12 "it"?

13           MR. SLATER:  Object to the form.

14           You can answer.

15      A   I think it's a -- kind of a

16 theoretical -- my understanding of that, it's a

17 theoretical reference to a system that you

18 disagree with, a system of slavery or policies.

19      Q   That's a phrase, I think you said -- and

20 if you didn't I gleaned it from somewhere else.

21 That's a phrase that Ms. Smith used, correct?

22      A   Yes.

23      Q   But you don't have any better idea of

24 the meaning of the phrase, other than what you've

25 told me?

```
 1        A    No.
 2        Q    Okay.  A number of noise-making devices
 3   at the protest, correct?
 4        A    Yes, a speaker and drums, and that sort
 5   of -- yes.
 6        Q    Do you know how many public address
 7   speakers were at the protest?
 8        A    No.
 9        Q    Do you know how many drums?
10        A    No.
11        Q    You had a cymbal, correct?
12        A    A cymbal, yes.
13        Q    Do you know how many cymbals were there?
14        A    No.
15        Q    There were fireworks there?
16        A    I saw something like a -- what do you
17   call that sort of firework?  Like, a sparkler --
18   like, a ground sparkler, you know, the sort that
19   you light and -- fountain firework.
20        Q    Okay.  Do you know where those came
21   from?
22        A    I don't.
23        Q    Florida Prisoner Solidarity -- if I
24   misidentify that group, let me know, but it's
25   Florida Prisoner Solidarity, correct?
```

1    but something to that effect.

2        **Q    Okay.  And when you heard that**

3    **announcement, what did you do?**

4            MR. SLATER:  Object to the form.

5            You can answer.

6        A    I walked with the group off the property

7    of the Florida State Prison to the DOT

8    right-of-way where cars were parked.

9        **Q    Okay.  Did you say anything during that**

10   **time?**

11       A    Yes.

12       **Q    What did you say?**

13       A    I witnessed someone being arrested.  And

14   I expressed feelings about the arrest being made,

15   and some disappointment and frustration with the

16   law enforcement officer's conduct.

17       **Q    So let's talk about that.  Who was**

18   **getting arrested?**

19       A    The person that I was witnessing being

20   arrested, her name was Danielle Johnson.

21       **Q    And did you know Danielle before this?**

22       A    Yes.

23       **Q    Had you worked with her on these types**

24   **of issues and protests before?**

25       A    Yes.

```
 1   of Corrections.  So that -- this was my -- my

 2   thinking at the time, as I recall.

 3        Q   Okay.  What were you doing physically

 4   while you were saying these things to law

 5   enforcement?

 6        A   There was -- I recall chanting.  And I

 7   had a cymbal.  So it was like a protest moment,

 8   like a loud -- and a lot of energy, and then I

 9   think a lot of fear, people -- one person was

10   arrested, that people were starting to kind of

11   scatter for fear of being arrested.

12        Q   Were you moving at all during that time

13   when you're having that exchange with law

14   enforcement, or when you're -- when you're

15   expressing your feelings to law enforcement?

16        A   I was standing next to a car, so maybe I

17   was moving, but I don't -- I don't know exactly

18   where.  I was standing near the road, so I had

19   moved, if that's what you're asking.  I felt I

20   was on the DOT right-of-way at the time.

21        Q   But you may not have been physically

22   moving at that time?

23        A   At the time that I was speaking to

24   Sumner?

25        Q   Yes, sir.
```

1      A   I remember him saying, "Do you want to

2   talk shit?  You'll be arrested next," and then I

3   started to walk away towards the car to leave,

4   and then I felt my arms being grabbed and

5   handcuffed.

6      **Q   Okay.  So you were stationary.  Deputy**

7   **Sumner said something about talking shit --**

8      A   Right.

9      **Q   -- and then you started moving?**

10     A   Yes.

11     **Q   Okay.  How long after that original**

12  **announcement where you were instructed to**

13  **disperse did what we just talked about take**

14  **place?**

15     A   I don't know.  I think minutes.

16     **Q   More than two minutes?**

17     A   I don't -- two minutes sounds like an

18  estimation.

19     **Q   Could it be more than four minutes?**

20     A   It could be.

21     **Q   More than five minutes?**

22     A   I don't think so.

23     **Q   When you heard that announcement, how**

24  **far away from your car were you, the announcement**

25  **to disperse?  How far away from your car were**

```
 1        Q    Were you made to pay any fines?

 2        A    Yes.  I paid the costs of probation and

 3   the costs of court.  I don't remember exactly,

 4   but...

 5        Q    Were you made to pay any restitution?

 6        A    No.  To be clear, I was facing -- I

 7   mean, the charges carried a two-year sentence, so

 8   I made the plea -- what I believe was in my best

 9   interest, although I still believe today that I

10   was conducting First Amendment protected activity

11   and was not on the property of the Department of

12   Corrections, but I couldn't risk being away from

13   my family for two years.

14             I mean, the risk was too great to go to

15   trial.  But Danielle did go to trial on the same

16   charges and won at trial, for what that's worth.

17        Q    So Deputy Sumner then lifted you, tried

18   to drag you to the car, correct?

19             MR. SLATER:  Object to the form.

20   BY MR. CARSON:

21        Q    Yeah.  That was a terrible question.

22   Let me ask it again.

23             What happened after you -- the last

24   sentence in paragraph 18 is as an act of passive

25   resistance, you said, "Fuck you.  I'm not
```

PETER (PANAGIOTI) TSOLKAS vs DEPUTY DALTON SUMNER
Tsolkas, Peter on 10/02/2024                                                                      Page 38

1    walking, you fucking pig," and kneeled.

2          What happened next?

3          A    Okay.  To elaborate on the -- where it

4    says "and kneeled," it's -- you know, I've been

5    to a lot of protests.  In fact, I've conducted

6    trainings on what to do if you're arrested.  And

7    I participated in those trainings and also

8    provided them.

9          And in my experience and my belief,

10   being arrested in what the moment I felt, and

11   continue to feel, was a wrongful arrest, that

12   going limp is a form of passive resistance that

13   ensures law enforcement that you're not -- not a

14   threat, because you're, in fact, not moving at

15   all.

16         So while I recognize there's going to be

17   some inconvenience to that, there's also some

18   safety and protections, that you're not

19   thrashing, you're not stiff or resisting.

20         So in my experience, usually at that

21   point I've been carried.  But in this case, when

22   I explained -- using some rough language, but I

23   explained with my words -- again, as a person who

24   respects the Constitution and the First

25   Amendment, that -- I used words.

1          And in response, I was thrown to the

2    ground and driven to the ground hard enough that

3    my shoulder was injured severely.

4          And so in that moment of indicating that

5    I was not walking, instead of being carried, I

6    was slammed to the ground, and with significant

7    force and intentional force on my shoulder, so

8    that I still have, you know, scars today from it.

9          And I felt it in direct response to

10   things I had said that Sumner appeared to be

11   offended by or upset by.  And that's why we're

12   here today.

13        **Q   You said Deputy Sumner applied**

14   **intentional force on your shoulder?**

15        A   Yes.

16        **Q   How so?**

17        A   In driving me to the ground and putting

18   enough weight on one specific shoulder that it

19   would be injured.

20        **Q   He placed force on your shoulder?**

21        A   Yes.

22        **Q   What shoulder?**

23        A   My left shoulder.

24        **Q   How did he place force on your left**

25   **shoulder?**

PETER (PANAGIOTI) TSOLKAS vs DEPUTY DALTON SUMNER
Tsolkas, Peter on 10/02/2024

1    A    Well, I was on the ground, so I -- you

2    know, I'm now, at this point, going off the

3    video, off the body camera video, and video by

4    the people that I've seen, to try and understand

5    the injury that I was sent to the hospital for,

6    but that --

7        Q    Let me interrupt you real quick.

8        A    Yes.

9        Q    And I'm glad you said based on the video

10   trying to piece it together.  When it's

11   happening, do you feel Deputy Sumner placing

12   force on your left shoulder?

13       A    Yes.  I feel the angle of my body

14   hitting the ground, my face, chest, like a -- a

15   sharp pain in my shoulder.  And, you know, at the

16   time it's sort of chaotic, so it's hard to fully

17   understand what's happening, except for that the

18   pain felt very intentionally applied by someone

19   who was, as an act of aggression -- you know, was

20   mad about having to arrest me or having to carry

21   me or something.  That's the feeling I remember

22   having.

23       Q    Let's talk about each of those things.

24   Okay?

25       A    Okay.

PETER (PANAGIOTI) TSOLKAS vs DEPUTY DALTON SUMNER
Tsolkas, Peter on 10/02/2024                                                     Page 41

1      Q    You said it was an act of aggression and

2   that Deputy Sumner was mad.

3           What are you basing that on?

4      A    Just the feeling of when someone's

5   pushing your body after having handcuffed you and

6   then said, you know, "You want to talk shit?"

7           And I was feeling that he had felt some

8   disagreements with me and, you know, maybe didn't

9   want to be there, or maybe -- I don't know his --

10  you know, his feelings.

11          I just know what I experienced was

12  verbal aggression, being arrested for what I felt

13  was unnecessary and an unlawful arrest, and --

14  and then what I indicated, when I called him a

15  fucking pig, because I was very angry about him

16  violating the Constitution and not respecting

17  First Amendment rights to protest.

18          In response or retaliation to that, he

19  pushed me to the ground and put his weight on my

20  body enough to injure me.

21     Q    We're going to break down the fall and

22  the actual mechanism of injury in great detail in

23  just a minute.

24          I want to talk some more about what

25  basis you have for your assertion that Deputy

```
 1   your mind, what would have been a good outcome
 2   there?  And what would that have involved
 3   vis-`-vis Deputy Sumner?
 4        A    To not feel the full weight of his body
 5   pressed down on mine and injure my shoulder.
 6        Q    Okay.  Thank you.
 7             And I realize you may at some point
 8   think I'm trying to be a smart aleck.  I'm not.
 9   That's what I'm hoping you would tell me.
10             If he doesn't touch you -- if he lets
11   go -- if Deputy Sumner lets go of you when you go
12   down on your knees, what happens next?
13        A    I hit the ground.
14        Q    Your chest would hit the ground?
15        A    Chest or face, yeah.
16        Q    Okay.
17        A    But that would be preferable than having
18   my shoulder hit the ground with such force that
19   it required stitching.
20        Q    Sure.  And I get that.  I mean, that's
21   why we're here, right, but for the injury that
22   you suffered?  You know, if he were to let go and
23   you just hit the ground, then, you know, he would
24   have waited for his partner, they would have
25   dragged you off and we probably wouldn't be here.
```

1    6, 2020, you are claiming emotional-type damages

2    related to your inability to fully support your

3    family during that time.

4        A    Correct.

5        Q    So I want to kind of get a handle on,

6    you know, what money were you making prior to

7    this incident and what kind of money were you

8    making after this incident, and what the

9    difference was as a result of -- or allegedly as

10   a result of your injury.

11            So we talked a little bit about the

12   things you were doing at that time, working for

13   the painting company, community farming, and then

14   providing, I guess, digital com services to the

15   organizations.

16            How did that change after you were

17   injured?

18       A    Because my availability was limited.  My

19   ability to use one of my arms was severely

20   limited, so manual labor was out of the question,

21   and even computer work was difficult.

22            But, again, I think it's made clear in

23   these questions it's not -- not a pursuit of lost

24   wages.  So the biggest, to me, impact was that I

25   couldn't be as present for my family.

PETER (PANAGIOTI) TSOLKAS vs DEPUTY DALTON SUMNER
Tsolkas, Peter on 10/02/2024

Page 64

1           So while there was some difficulty --

2   challenges economically, the bigger challenge was

3   being -- you know, that my kids -- you know,

4   they're really physical and active.  They want to

5   play.  They want to be picked up.  So not being

6   present and part of that, especially at that age

7   that they were.

8           And up until this day still, when I have

9   my shirt off, they touch the scar and "What

10  happened to that?  How did that happen again?"

11          My daughter was three at the time, so

12  she's just -- her stories of it is still -- you

13  know, it's like reliving the trauma that I was

14  sent to the hospital by a law enforcement

15  officer.  It definitely shaped how they view

16  things and how they see law enforcement, how --

17  you know, their level of trust, their fear about

18  things.

19          To me, like, I want my children growing

20  up with a healthy respect and, you know, a

21  passion, even, like, about the First Amendment

22  and the Constitution and things that are --

23  should be considered inherent rights, instead of

24  having a fear, "Oh, this is what happens if you

25  say something the police officer doesn't like."

PETER (PANAGIOTI) TSOLKAS vs DEPUTY DALTON SUMNER
Tsolkas, Peter on 10/02/2024                                                                Page 65

1    You know, you can end up in the hospital.  You

2    can end up with scars.

3              So those are things that I really -- my

4    experience was that physically I couldn't be

5    present with my children for months after this

6    injury.

7              And psychologically it's something

8    that's reoccurring.  Like, it still is a -- it's

9    trauma on my family.  It created this sort of

10   hardship about not being able to do household

11   chores, being pretty much less efficient with

12   everything, from parenting to household

13   responsibilities.

14             I understand that's not, you know --

15   maybe it's hard to put a math equation to it.

16   But that's what it is.

17        **Q   Okay.  As we sit here today, can you**

18   **tell me how much money you lost in wages as a**

19   **result of this incident?**

20        A   No.

21        **Q   You said that for your children it has**

22   **shaped how they view things.  What did you mean**

23   **by that?**

24        A   That they were present, and then also

25   lived with a -- the experience -- the story of me

PETER (PANAGIOTI) TSOLKAS vs DEPUTY DALTON SUMNER
Tsolkas, Peter on 10/02/2024                                                    Page 66

```
 1   getting sent to the hospital by a law enforcement
 2   officer, and that they're, you know -- something
 3   that they're -- that affected their lives, that
 4   they think about, they talk about, and they
 5   were -- you know, they were scared or worried.
 6       Q   What were their feelings or opinions
 7   about law enforcement prior to this incident?
 8       A   I don't know.
 9       Q   I mean, I'm just listening to the
10   language at the protest that you brought your
11   children to.  Not a lot of warm and fuzzy
12   feelings regarding law enforcement, as far as I
13   could hear.
14       A   It was a -- I think the protest got, you
15   know, really intensified by the police response
16   to the protest.
17       Q   What do you mean intensified?
18       A   I think the police were telling people
19   you have 30 seconds to leave or you'll all be
20   arrested, we're going to tow your cars, and then
21   started arresting people.
22       Q   I mean, before they got there it was
23   banging on drums, PAs, sirens, fireworks, paint,
24   banners.  I think one video shows a gentleman
25   climbing onto the -- the arch sign over the
```

PETER (PANAGIOTI) TSOLKAS vs DEPUTY DALTON SUMNER
Tsolkas, Peter on 10/02/2024                                                    Page 67

1    entrance to the prison.

2        A    It was a really impassioned protest

3    and -- you know, as protests tend to be, and --

4    but the real trauma from the protest came through

5    law enforcement's response for my children.

6             You know, some of the things that you

7    mentioned are not things that had an affect on

8    them.  But seeing people -- finding out their

9    father was injured and seeing people arrested,

10   those are the things that really left the marks.

11       Q    Do you know what caused -- you

12   essentially had a puncture wound on your

13   shoulder, correct?

14       A    (Nods head affirmatively.)

15            MR. SLATER:  Object to the form.

16            You can answer.  You can answer.

17       A    I don't know.

18       Q    The skin was broken, correct?

19       A    Yes.

20       Q    Let me just start over again.

21            After you go to the ground -- and let's

22   just call it you going to the ground --

23       A    Yeah.

24       Q    -- and you injure your left shoulder,

25   the skin was broken on your left shoulder,

1   correct?

2       A    Correct.

3       Q    **Do you know what caused that?**

4       A    I believe --

5            MR. SLATER:  Object to the form.

6            You can answer.

7       A    -- it was the force and hitting

8   something on the ground.  I don't know exactly

9   what caused the type of damage it was, aside from

10  the amount of pressure, you know, being pushed on

11  to -- the ground was uneven.

12           Maybe there was a rock or stick or

13  something in the ground, but it was -- you know,

14  the amount of pressure, combined with whatever my

15  shoulder hit, was what caused the injury.

16      Q    **If you go to your car and leave within**

17  **60 seconds of being instructed to do so, you**

18  **wouldn't have been injured that day, correct?**

19           MR. SLATER:  Object to the form.

20      A    I don't know that we can predict the --

21  the outcome of events.  That's...

22      Q    **Well, you testified that the time had**

23  **elapsed between being told "leave now, disperse,**

24  **you're trespassing," and the time you were placed**

25  **under arrest by Deputy Sumner was at least two**

PETER (PANAGIOTI) TSOLKAS vs DEPUTY DALTON SUMNER
Tsolkas, Peter on 10/02/2024                                                    Page 69

1    minutes, correct?

2        A    Something to that effect.

3        Q    Yeah.  So if you would have left at the

4    one-minute mark, you wouldn't have had any

5    interaction with Deputy Sumner at all, would you?

6            MR. SLATER:  Object to the form.

7        A    I think that's -- I guess it doesn't

8    seem relevant to the conversation.  I mean, the

9    question here is what happens after someone's put

10   in handcuffs.  Should they be assaulted or should

11   they be treated with basic dignity and respect

12   and not harmed physically?

13       Q    If you walk to Deputy Sumner's vehicle,

14   you wouldn't have hurt your left shoulder on that

15   rock or stick, correct?

16           MR. SLATER:  Object to the form.

17       A    I didn't hurt my shoulder.  My shoulder

18   was injured in the process of, I think, a blatant

19   violation of my rights, which is -- although I

20   didn't feel I should have been arrested, I didn't

21   resist the arrest.

22           I was put in handcuffs.  And I guess

23   I just -- you know, I know enough -- or I believe

24   enough in this basic kind of, like, rights and

25   responsibilities that -- you know, I wasn't

1   physically aggressive or a flight risk.

2          But even though I was already in

3   handcuffs, I ended up in the hospital.  And I

4   think, again, that's the conversation -- that's,

5   you know -- I didn't -- you know, if I would have

6   tripped and fallen down and bumped my head, then,

7   no, I wouldn't be here, you know, in a lawsuit

8   against Sumner, but that's not what happened.

9      **Q    I understand.  And I understand your**

10  **reluctance to answer these questions, but they're**

11  **not difficult.**

12         A    Okay.

13     **Q    The simple fact is, if you would have**

14  **walked as you were directed to, you would not**

15  **have suffered an injury, correct?**

16         A    I don't know that.

17             MR. SLATER:  Object to the form.

18             You may answer.

19         A    Okay.

20     **Q    How do you not know that?**

21         A    Because I believe what Sumner did -- I

22  mean, it's possible to carry or even drag

23  someone.  As unpleasant as being dragged is,

24  you're not -- you know, if -- it's without

25  injuring them to the point where they go to the

1   hospital.

2         So, you know, if I would have said to

3   Sumner -- if I would have said something he

4   didn't want to hear and he would have decided to

5   take out his aggression on me, regardless of

6   whether I'm walking or not, I think it's

7   plausible that I could have still ended up

8   injured, because I don't know why he pushed me to

9   the ground.

10         I'm assuming it's because he felt

11   insulted or he felt -- he felt some sort of way

12   through the verbal comments that either myself or

13   someone else made and he took it out on me.

14   **Q   You landed with the majority of your**

15   **body weight on your left shoulder, correct?**

16         MR. SLATER:  Object to the form.

17   A   I don't know.

18   **Q   Okay.  Do you know what part of your**

19   **body hit the ground first?**

20   A   I don't.  It may have been my --

21   probably my knees.  I think that's the -- you

22   know, I'm going -- again, I'm going off seeing

23   pictures and videos, because the experience, you

24   know, is -- what I remember was the amount of

25   force on my body and the pain in my left

```
 1   shoulder.
 2          But the -- yeah, so I -- I think my
 3   knees would be the -- have been the first to hit
 4   the ground.
 5      Q    And then what?
 6      A    And then the rest of my body.
 7      Q    What, all at once?
 8      A    I don't know.
 9      Q    Okay.
10          MR. SLATER:  Can we take a five-minute
11      break?
12          MR. CARSON:  Absolutely.  Yes.
13      (Short recess.)
14          MR. CARSON:  Back on the record.
15   BY MR. CARSON:
16      Q    All right.  Mr. Tsolkas, other than what
17   you have already said, do you recall anything
18   else that Deputy Sumner said that day?
19      A    No.
20      Q    Other than what we've already discussed,
21   do you remember anything else Deputy Sumner did
22   that day?
23      A    No.
24      Q    Have you heard reports of any other
25   statement about -- or, I'm sorry, by Deputy
```

PETER (PANAGIOTI) TSOLKAS vs DEPUTY DALTON SUMNER
Tsolkas, Peter on 10/02/2024                                                    Page 83

1        A    Yes.

2        Q    And you discussed going limp at one

3   point onto your knees, right?

4        A    Yeah.

5        Q    And you -- you stated that you hadn't

6   watched the video for several months, right?

7        A    Yes.

8        Q    You hadn't watched the video this

9   morning before coming to the deposition; is that

10  correct?

11       A    Correct.

12       Q    Okay.  I want to walk through one of the

13  videos.  I'm just going to pull it up on my

14  screen here.  And I'll represent that this is a

15  cell phone video titled December 6, 2020,

16  4:28:26 p.m., dot, MOV.

17            MR. SLATER:  This is one of the ones

18       that we produced to you.

19            MR. CARSON:  Is that Mr. Hernandez's

20       cell phone?

21            MR. SLATER:  This is Mr. Hernandez's

22       cell phone information.

23  BY MR. SLATER:

24       Q    And I'm just going to start.  Let me get

25  my volume up.

```
1              Okay.  I'm just going to stop here.
2     It's -- it's one second into the footage.  And I
3     see here there's a sedan, and behind it there's a
4     man wearing a hoodie.  Is that you?
5          A   Yes.
6          Q   And the man behind you, the officer, is
7     that Deputy Sumner?
8          A   I believe so, yes.
9          Q   Okay.  I'm going to continue to play the
10    video.
11             Okay.  I'm going to pause here at
12    7 seconds in.  And we see that Deputy Sumner is
13    taking you away from that car, right?
14         A   Yes.
15         Q   Are you limp at this point?
16         A   Not at this point, no.
17         Q   No?  You're walking?
18         A   Yes.
19         Q   Okay.  And he walks you -- I'm going to
20    pause again here.  At about 10 seconds in, he
21    walks you to this -- what appears to be a truck,
22    the flatbed of a truck, right?
23         A   Yes.
24         Q   And at that point, about 10 seconds, I
25    see that your knees are bent.
```

```
 1        A    Yes.

 2        Q    When we discuss you going limp -- I'm

 3   pausing again here at 11 seconds.  You're now on

 4   the ground.

 5        A    Yes.

 6        Q    When you were discussing going limp, is

 7   that what -- is that what you were discussing --

 8        A    Yes.

 9        Q    -- what we're watching there?  So that's

10   after he had walked you from the car -- the sedan

11   to this truck?

12        A    Yes.

13        Q    And I see that he has what appears to be

14   his left hand and right hand -- I can try to -- I

15   don't know if I can make this bigger.  One

16   second.  I'm just going to zoom in as best as I

17   can.  Let's go back to 11 seconds.

18             Okay.  So at 11 seconds here, you are on

19   the ground.  And we can see that Deputy Sumner

20   appears to have his hands on what is your right

21   arm.

22             Do you see that?

23             MR. CARSON:  Object to form.

24   BY MR. SLATER:

25        Q    You can answer.
```

```
 1        A    Yes.

 2        Q    Okay.  And I'm going to play.

 3             I'm going to stop here again just about

 4   a second later.  You can see that Deputy Sumner

 5   has picked you up.

 6             Is that right?

 7             MR. CARSON:  Object to form.

 8        A    Yes.

 9        Q    And he has his arms cusping your arms

10   from behind; is that right?

11             MR. CARSON:  Form.

12        A    Correct.

13        Q    And your hands are cuffed at this point?

14             MR. CARSON:  Form.

15        A    Correct.

16        Q    Okay.  And I'm going to play the video

17   again.

18             And you can see here that your legs are

19   moving for a brief period of time.

20             Would you still say you're limp at this

21   point?

22        A    Yes.

23             MR. CARSON:  Form.

24   BY MR. SLATER:

25        Q    Okay.  And it looks like several
```

PETER (PANAGIOTI) TSOLKAS vs DEPUTY DALTON SUMNER
Tsolkas, Peter on 10/02/2024                                                                    Page 87

```
1    steps -- you've moved now several steps from when

2    you were on your knees at the car; is that right?

3              MR. CARSON:  I'm looking to interject

4         for just a second.

5              MR. SLATER:  Yeah.

6              MR. CARSON:  Mr. Tsolkas, I'm likely to

7         object to the form of a lot of these

8         questions.  So I'm going to ask you to give

9         me, like, a brief period to interject.

10             So I apologize, James.

11             MR. SLATER:  That's fine.

12             MR. CARSON:  I'm going to object to the

13        form of that question as well.

14   BY MR. SLATER:

15        Q   Okay.  Let me just get the timestamp

16   here.  We're 14 seconds into this video.  And you

17   can see here, Mr. Tsolkas, that Deputy Sumner is

18   standing behind you.  And it appears that you are

19   sort of traveling forward at this point.  Is that

20   correct?

21             MR. CARSON:  Form.

22   BY MR. SLATER:

23        Q   You can answer.

24        A   Yes.

25        Q   Okay.  I'm going to pause here again at
```

```
 1    14 seconds.  So it's about 3 or 4 seconds after

 2    you were on your knees at the truck.  Is that

 3    right?

 4              MR. CARSON:  Form.

 5    BY MR. SLATER:

 6         Q    You can answer.

 7         A    Yes.

 8         Q    Okay.  When you described Deputy Sumner

 9    putting his weight on you and bringing you to the

10    ground, would this be the time that you described

11    that in your earlier testimony?

12              MR. CARSON:  Form.

13         A    Yes.

14         Q    So this is several seconds after you

15    went limp?

16              MR. CARSON:  Form.

17         A    Yes.

18         Q    So it's not that you went limp and then

19    the force happened right after that.  This was

20    after he had dragged you, or you had -- let me

21    use neutral language, after you had gone several

22    feet from that truck.  Is that right?

23              MR. CARSON:  Form.

24         A    Yes.

25         Q    So it's your testimony that you were
```

1    already limp several seconds before you had come

2    to the ground at this point; is that right?

3         A    Yes.

4         Q    Okay.  We're at 14 seconds.

5              And here I'm going to pause it to 15

6    seconds.  That's where you hit the ground.  Is

7    that right?

8         A    Yes.

9         Q    And my understanding from your testimony

10   is that you were -- you understand that Deputy

11   Sumner pushed you to the ground.  Is that right?

12             MR. CARSON:  Form.

13        A    Yes.

14        Q    You didn't fall to the ground here,

15   right?

16             MR. CARSON:  Form.

17        A    No.

18        Q    There were certain aspects of your

19   testimony today where you stated that you

20   couldn't quite remember what happened during the

21   incident.

22             And is it safe to say that to the extent

23   that you don't remember something that the

24   video -- and there's multiple videos of this

25   incident, that those would be the best evidence

PETER (PANAGIOTI) TSOLKAS vs DEPUTY DALTON SUMNER
Tsolkas, Peter on 10/02/2024

Page 92

```
 1                    CERTIFICATE OF OATH

 2

 3    STATE OF FLORIDA)
      COUNTY OF DUVAL )
 4

 5        I, Shannon M. Bishop, Court Reporter, Notary

 6    Public, State of Florida, certify that PETER

 7    TSOLKAS personally appeared before me on

 8    October 2, 2024, and was duly sworn.

 9

10        Witness my hand and official seal, October

11    11, 2024.

12

13                    Shannon M. Bishop

14                    _____

15                    Shannon M. Bishop, RDR, CRR, CRC

16                    Notary Public

17                    My Commission No. HH 127460

18                    Expires August 20, 2025

19                    Bonded Thru Budget Notary Services

20

21

22

23

24

25
```

PETER (PANAGIOTI) TSOLKAS vs DEPUTY DALTON SUMNER
Tsolkas, Peter on 10/02/2024                                                    Page 93

```
 1                    REPORTER'S CERTIFICATE

 2

     STATE OF FLORIDA)
 3   COUNTY OF DUVAL )

 4

 5           I, Shannon M. Bishop, Court Reporter and

 6   Notary Public, duly qualified in and for the

 7   State of Florida, do hereby certify that I was

 8   authorized to and did stenographically report the

 9   foregoing deposition; and that the transcript is

10   a true record of the testimony given by the

11   witness.

12        I further certify that I am not a relative,

13   employee, attorney or counsel of any of the

14   parties, nor am I a relative or employee of any

15   of the parties' attorney or counsel connected

16   with the action, nor am I financially interested

17   in the action.

18        Dated this 11th day of October, 2024.

19                   Shannon M. Bishop

20                   _____
                     Shannon M. Bishop, RDR, CRR, CRC
21

22

23

24

25
```