UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | |
|---|---|
| Peter (Panagioti) Tsolkas,<br><br>    Plaintiff,<br><br>v.<br><br>Deputy Dalton Sumner,<br><br>    Defendant. | Case No. 3:23-cv-01428-WWB-PDB |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO**
**<u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiff Peter (Panagioti) Tsolkas responds to Defendant Dalton Sumner's motion for summary judgment. [ECF No. 23]. Contrary to Deputy Sumner's position that he never pushed Mr. Tsolkas to the ground [ECF No. 23 at 8], there are material facts in dispute over whether Deputy Sumner "followed" Mr. Tsolkas to the ground, as he says, or whether he shoved a restrained Mr. Tsolkas onto the ground, as Mr. Tsolkas and eyewitnesses say. There is also a material dispute about whether a reasonable jury could conclude that the reason Deputy Sumner shoved Mr. Tsolkas to the ground was because of Mr. Tsolkas's pejorative—but protected—speech about Deputy Sumner before and during the arrest. Because those matters are material and in dispute, Mr. Tsolkas's claims must be resolved by a jury.

**Plaintiff's Opposing Statement of Facts**

On December 6, 2020, Mr. Tsolkas participated in a demonstration at Florida State Prison in Raiford, Florida. *See* Deposition of Peter Tsolkas at 18:10-14, ECF No. 26-1. Mr. Tsolkas and others participated in this demonstration in memory of their recently deceased friend, Karen Smith, who was a long-time prisoners' rights advocate. [*Id.* at 21:19–22:17]. At the protest, Mr. Tsolkas was adorned in a dark hoodie and carried a cymbal, which he played while protesting conditions at the prison in Karen Smith's memory. [ECF No. 22-4 at 5:50]; [ECF No. 26-1 at 18:15–19:5, 24:11-12, 84:1-5].

Sometime during the demonstration, law enforcement arrived, including Deputy Sumner of the Bradford County Sheriff's Office (BCSO). [*See*, *generally*, ECF No. 22-4 at 00:00-05]. Deputy Sumner broadcast an announcement to disperse over the P.A. system of his patrol car. [*See id.* at 1:22-43]. After that, Mr. Tsolkas walked towards the easement, which he believed was a Florida Department of Transportation easement. [ECF No. 26-1 at 27:2-8, 31:3-20]. After watching officers make an arrest, Mr. Tsolkas informed Deputy Sumner that he was on public property. [ECF No. 22-4 at 6:00]. While pointing his Taser at Mr. Tsolkas, Deputy Sumner said "no it's not":



[*Id.*]; *see also* Deposition of Dalton Sumner at 35:15–36:2, ECF No. 26-2.

Mr. Tsolkas then backed away toward the roadside as Deputy Sumner approached pointing his Taser at him. [ECF No. 22-4 at 6:00-07]. He asked Deputy Sumner if "you guys [are] gonna do dirty work for these [meaning Florida Department of Corrections] fucking assholes?" [*Id.* at 6:14-17]. Deputy Sumner turned and faced Mr. Tsolkas, who was standing by the roadside:



3

[ECF No. 1 ¶ 16]; [ECF No. 22-4 at 6:18]. Deputy Sumner then approached Mr. Tsolkas and said "Come here. You want to talk shit. Come here." [ECF No. 22-4 at 6:18-21]; [ECF No. 26-1 at 31:12–32:10]. At this time, Mr. Tsolkas, who was stationary, began to move away from Deputy Sumner towards the road. [ECF No. 26-1 at 32:6-10]. Deputy Sumner then placed Mr. Tsolkas under arrest and applied handcuffs, restraining Mr. Tsolkas's hands behind his back. [ECF No. 22-4 at 6:23-34].

While Mr. Tsolkas was being taken away by Deputy Sumner, he asked him if he "supports these assholes," to which Mr. Tsolkas told him to "walk." Mr. Tsolkas said "fuck you, I'm not walking, you fucking pig" and kneeled. [ECF No. 22-4 6:45–55].[1] Deputy Sumner then lifted Mr. Tsolkas up off the ground, with his arm looped through Mr. Tsolkas's arms:



[ECF No. 22-6 at 0:11].

---

[1] When Mr. Tsolkas referenced "passive resistance" in his Complaint, he referred to this moment when he kneeled in response to Deputy Sumner ordering him to walk. [ECF No. 1 at ¶ 18].

4

At that time, Sergeant Hullender of BCSO was standing nearby. [ECF No. 26-2 at 41:20–42:11]. According to BCSO policies and procedures, Deputy Sumner was required to seek assistance to transport Mr. Tsolkas after arrest. [ECF No. 26-6, § III.D.3, BCSO Standard Operating Guidelines on Civil Disturbances/Mass Arrests ("Two or more deputies will carry an arrestee who is seated and refuses to walk."); [ECF No. 26-2 at 60:21-24 (acknowledging that the protest was considered a civil disturbance). After picking up Mr. Tsolkas without assistance, Deputy Sumner dragged him several steps before deliberately slamming him down onto the ground while his hands were still restrained behind his back:



[ECF No. 22-6 at 00:15]. Mr. Tsolkas did not assist Deputy Sumner in any way from when he kneeled by the truck, instead he merely remained limp until pushed to the ground. [ECF No. 26-1 at 37:21–39:12, 83:2–86:22, 88:25–89:3]. Indeed, Mr. Tsolkas did not fall but was pushed or "relocated" to the ground, as Deputy Sumner put it in his sworn report. [ECF No. 22-1 at 3]; [see also ECF No. 26-1 at 89:9-17].

According to Mr. Tsolkas, he was pushed to the ground because of his "rough language" to Deputy Sumner. [ECF No. 26-1 at 37:21–39:12, 70:13–71:13]. Deputy Sumner also testified that, although he denies pushing Mr. Tsolkas, it would have been fine for him to do so under the circumstances. [ECF No. 26-2 at 71:15–74:7]. And when asked whether he believed it was acceptable to shove Mr. Tsolkas because he called him a "fucking pig," Deputy Sumner responded that he did not remember how he felt that day. [Id. at 57:13–58:3].

Eyewitnesses also observed Deputy Sumner shove Mr. Tsolkas to the ground. See Affidavit of Kaithleen Hernandez at ¶ 7, ECF No. 26-4; see also Deposition of Brackin Camp at 11:20–12:6, 20:20–21:4, ECF No. 26-3. According to Ms. Camp, she saw Deputy Sumner "push [Mr. Tsolkas] down very distinctly." [ECF No. 26-4 at at 22:17-19]. When asked what she saw that made her believe he was pushed rather than falling, she testified: "The way that he was pushed to the ground, like, it was with a rigorous, violent force. It was a push down. It wasn't that he fell to the ground." [Id. at 24:13-17]. According to her, she witnessed Mr. Tsolkas's left shoulder hit the ground first from Deputy Sumner

6

pushing Mr. Tsolkas from the back. [*Id. at* 24:18-25]. Mr. Tsolkas also recalls that there was force on his body and pain in his left shoulder when he was taken down to the ground. [ECF No. 26-1 at 39:13–40:22, 71:18–72:4]. The video depicts Deputy Sumner's left knee contacting Mr. Tsolkas's body after Deputy Sumner shoved him to the ground. [ECF No. 22-4 at 6:55-57, ECF No. 22-6 at 00:11-16]. Only then did Deputy Sumner obtain help from the sergeant standing nearby to help carry a limp Mr. Tsolkas. [ECF No. 22-6 at 00:15-21].

Mr. Tsolkas was injured as a result of being pushed by Deputy Sumner. [ECF No. 26-1 at 39:13–40:22, 67:11–70:8]. He suffered a laceration on his left shoulder and was taken by ambulance to the hospital for treatment and stitches:



[ECF No. 1 ¶ 21]; [ECF No. 26-1 at 48:17-19]; [ECF No. 26-2 at 66:22–67:8]. He still has scars today. [ECF No. 26-1 at 39:4-8]. As a result of the injuries, Mr.

Tsolkas was unable for a time to participate in caring for his young children and help with family activities, humiliating him and causing emotional distress. [ECF No. 26-1 at 63:16–65:16]; *see also* Plaintiff's Response to Interrogatory No. 7, ECF No. 26-7.

## Memorandum of Law

Summary judgment may be granted only when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court considering a summary judgment motion must "draw all reasonable inferences in favor of the party opposing summary judgment." *Glasscox v. Argo*, 903 F.3d 1207, 1212 (11th Cir. 2018). Even when the parties agree on a set of facts, a court should deny summary judgment if "reasonable minds might differ on the inferences arising from undisputed facts." *Id*. (quotation omitted). If a factfinder could draw more than one inference from a set of facts, and those multiple inferences create a genuine issue of material fact, summary judgment must be denied. *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1315 (11th Cir. 2007). Credibility determinations, weighing of evidence, and drawing of legitimate inferences are reserved for the jury, and a judge should not appropriate those functions when ruling on a motion for summary judgment. *Id*.

I. **A reasonable jury could conclude that Deputy Sumner gratuitously shoved Mr. Tsolkas to the ground while handcuffed in violation of the Fourth Amendment.**

   **A. Fourth Amendment standard.**

For Mr. Tsolkas to establish a claim under 42 U.S.C. § 1983, he must establish (1) a violation of a constitutional right, and (2) that the alleged violation was committed by a person acting under color of state law. *Holmes v. Crosby*, 418 F. 3d 1256, 1258 (11th Cir. 2005).

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The Fourth Amendment's freedom from unreasonable seizures includes the "right to be free from the use of excessive force in the course of an arrest." *Hardigree v. Lofton*, 992 F.3d 1216, 1231 (11th Cir. 2021). The reasonableness of force depends on "whether a reasonable officer would believe that this level of force is necessary in the situation at hand." *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002). This is not a situation where courts are asked to consider what the officer knew "with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009). In conducting this analysis, "the only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded." *Helm v. Rainbow City, Alabama*, 989 F.3d 1265, 1273 (11th Cir. 2021).

Legal authority holds that use of any force is unreasonable when a victim or suspect is compliant or securely in custody. *Croom v. Balkwill*, 645 F.3d 1240, 1252 n.17 (11th Cir. 2011); *Dominguez v. City of Sweetwater*, 610 F. App'x 948 (11th Cir. 2015) (unpublished) ("Although the use of *de minimis* force during a

valid seizure cannot give rise to an excessive force claim, *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir.2000), Officer Abreu cannot cite to any authority suggesting that the level of force he used was *de minimis* in the context of a compliant suspect who is securely in custody.").

### B. The video footage is not dispositive.

Here, whether Deputy Sumner used excessive force on Mr. Tsolkas is a question for a jury for one simple reason: Deputy Sumner attempts to persuade the Court that the video footage shows something that everyone can agree on. It does not. In his motion, he simply refers to time stamps from the videos and explains what he thinks is occurring in those moments. [*See, e.g.*, ECF 23 at 7]. He explains that he lost his footing and fell on Mr. Tsolkas (although he added that it would have been fine for him to shove Mr. Tsolkas to the ground with his hands cuffed behind his back). To prove this point he appends screenshots of him dragging Mr. Tsolkas. [*Id.* at 13]. Yet, according to Mr. Tsolkas and eyewitnesses, Deputy Sumner has it all wrong. Mr. Tsolkas did not fall forcing Deputy Sumner to "follow" him. No. Mr. Tsolkas and eyewitnesses testified that Deputy Sumner shoved Mr. Tsolkas to the ground, which can be more clearly seen in the screenshot on page 5 of this response, which was captured later in time. [ECF No. 22-6 at 00:15].

While some incidents can be examined by a Court based on video footage, here, whether Deputy Sumner lost his footing or shoved Mr. Tsolkas to the ground is not so black and white. It is only when "opposing parties tell two

different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007); *see also Morton v. Kirkwood*, 707 F.3d 1276, 1284 (11th Cir. 2013) ("[W]here an accurate video recording completely and clearly contradicts a party's testimony, that testimony becomes incredible."). And the Court must "credit[] Plaintiff's version of the record evidence" where the stories are not blatantly contradicted. *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010); *see also Shaw v. City of Selma*, 884 F.3d 1093, 1097 n.1 (11th Cir. 2018) (same).

Deputy Sumner asks the Court to conduct a frame-by-frame analysis of a few seconds of video footage to determine whether Mr. Tsolkas fell, or Deputy Sumner shoved him. That is outside the strict confines of Rule 56. Instead, because Mr. Tsolkas and eyewitnesses dispute Deputy Sumner's interpretation of what happened in those several seconds of footage, and their testimony is not "blatantly contradicted" by the video footage, the Court must credit them.

### C. Crediting Mr. Tsolkas, Deputy Sumner used excessive force in violation of clearly established law.

According to Mr. Tsolkas and eyewitnesses, Deputy Sumner pushed Mr. Tsolkas to the ground while his hands were cuffed behind his back after he had gone limp when ordered to "walk." Under those circumstances, a reasonable jury could find that Deputy Sumner violated the Fourth Amendment.

Under the *Graham* factors, and crediting Mr. Tsolkas's version of events, the record evidence demonstrates that Deputy Sumner used unreasonable force against Mr. Tsolkas—pushing him face-first onto the ground while his hands were cuffed behind his back. As to the nature of the underlying crime and Mr. Tsolkas's resistance, those factors militate against a finding of reasonableness. Mr. Tsolkas was arrested after telling Deputy Sumner that he was on public property and asking if he was going to do Florida Department of Corrections' "dirty work." [ECF No 22-4 at 6:00-17]. In response, Deputy Sumner approached and arrested him for "talking shit." [*Id.* at 6:18-21]. Mr. Tsolkas's crimes, for which he pleaded nolo contendere, were trespassing after warning and resisting without violence. [ECF No. 22-7]. Those are not serious crimes. As to Mr. Tsolkas's resistance, it was passive. He called Deputy Sumner a "fucking pig" and then was told to "walk." He kneeled instead and remained limp. [ECF No. 26-1 at 37:21–39:12, 83:2–86:22, 88:25–89:3]. Rather than adhering to agency policy to seek assistance in carrying Mr. Tsolkas, Deputy Sumner lifted him, dragged him, and then pushed him to the ground. Finally, the injury was serious. Mr. Tsolkas was taken to the hospital, stitched up, and unable to fully use his arm following the injury. *Cf. Gold v. City of Miami*, 121 F.3d 1442, 1444, 1446–47 (11th Cir. 1997) (the plaintiff experienced pain from tight handcuffs that left skin abrasions for which the plaintiff did not seek medical treatment; the "minor nature" of the plaintiff's injury suggested that the officer did not use excessive force). Under those facts—as well considering Deputy Sumner violated BCSO procedures by

attempting to carry Mr. Tsolkas even though there was another officer standing nearby—a reasonable jury could find a Fourth Amendment violation.

Further, even if the Court concluded that the force was *de minimis*, as Deputy Sumner suggests [ECF No. 23 at 15], it was clearly established then that officers cannot gratuitously use force—even *de minimis* force—on individuals who are not a threat. *Smith v. Mattox*, 127 F.3d 1416, 1418–20 (11th Cir. 1997) (no qualified immunity for officer breaking arm of suspect who "docilely submitted" to request to get down); *Priester v. City of Riviera Beach*, 208 F.3d 919, 926-27 (11th Cir. 2000) (no qualified immunity for K-9 attack when suspect was already subdued and lying on ground); *Hadley v. Guiterrez*, 526 F.3d 1324 1333–34 (11th Cir. 2008) ("Applying the excessive force standard would inevitably lead every reasonable officer ... to conclude that the force used here— punching a non-resisting criminal suspect for no apparent reason other than malice—is not protected by our constitution.") (quotations and citations omitted); *Oliver v. Fiorino*, 586 F.3d 898, 908 (11th Cir. 2009) ("obvious clarity" that use of Taser on compliant, non-resisting suspect "was so utterly disproportionate to the level of force reasonably necessary that any reasonable officer would have recognized that his actions were unlawful."); *Saunders v. Duke*, 766 F.3d 1262, 1268–69 (11th Cir. 2014) (gratuitous use of force is excessive); *Gomez v. United States*, 601 F. App'x 841, 850 (11th Cir. 2015) ("[T]he application of gratuitous force on an already-handcuffed and compliant detainee or arrestee constitutes

excessive force in violation of the Fourth Amendment, even if there is no visible or compensable injury.").

Finally, even if the Court were to consider that Mr. Tsolkas was disobeying a command to "walk," clearly established law dictates that Deputy Sumner violated the Fourth Amendment. That is because Mr. Tsolkas's refusal to get up and walk—after submitting to arrest—is not the kind of resistance that courts speak to when authorizing force. Here, Mr. Tsolkas allowed Deputy Sumner to handcuff him and then kneeled in response to being ordered to walk. Deputy Sumner was then required by policy to seek assistance to transport Mr. Tsolkas. Instead, he *chose* to drag and then throw him. *See Brown v. City of Huntsville*, 608 F.3d 724, 739 (11th Cir. 2010) (gratuitous force when officer pepper-sprayed a suspect who had already "submitted" to the officer's authority); *Reese v. Herbert*, 527 F.3d 1253, 1273-74 (11th Cir. 2008) (gratuitous force when officer kicked and beat arrestee who was lying face-down on the ground); *Gomez v. Lozano*, 839 F. Supp. 2d 1309, 1319 (S.D. Fla. 2012) ("A reasonable jury could conclude that the force used by Officer Lozano was excessive, even if Mr. Gomez minimally resisted.").

In *Brown*, for example, a panel of the Eleventh Circuit held that the officer used unconstitutionally excessive force even though the plaintiff was not handcuffed and was not fully secured. 608 F.3d at 739–40. It was enough that the officer used force on a non-threatening suspect "who had communicated her willingness to be arrested." *Id.* at 739. When considering "control," that standard

14

is certainly met if the arrestee "submit [s] to [the officer's] authority." *See Brown*, 608 F.3d at 740; *see also Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th Cir. 2000) (denying qualified immunity for officers who slammed arrestee's head on pavement and kicked him even though he was handcuffed and not struggling with the officers).

Even without such clear guidance from the Eleventh Circuit, direct caselaw on point is unnecessary because it was obvious that an officer cannot shove a restrained arrestee simply because the officer is upset by criticism from a victim they encounter. *Oliver*, 586 F.3d at 908 (holding that the facts of the plaintiff's case fell within the obvious clarity rule); *Smith*, 127 F.3d at 1420 (same); *Glasscox*, 903 F.3d at 1220 (same); *Fils v. City of Aventura*, 647 F.3d 1272, 1290 (11th Cir. 2011) (no qualified immunity under prior precedent and obvious clarity analyses for use of Taser on suspect who did not resist or disobey orders); *Stephens v. DeGiovanni*, 852 F.3d 1298, 1308 (11th Cir. 2017) (officer not entitled to qualified immunity from excessive force claim where he "unexpectedly slapped" a Bluetooth device from a plaintiff's ear and punched him in the chest "for no reason"). Here, Deputy Sumner chose to lift Mr. Tsolkas in violation of agency procedures after Mr. Tsolkas called him a "fucking pig" and then chose to push him down to the ground. The entire arrest started because, in Deputy Sumner's words, Mr. Tsolkas was "talking shit." Such "rough speech," as Mr. Tsolkas called it in his deposition, is not a valid exception to the guardrails of the Fourth Amendment (or the First).

15

In contrast, Deputy Sumner relies on an unpublished case—*Buckley v. Haddock*, 292 F. App'x 791 (11th Cir. 2008)—to explain that the Fourth Amendment did not require him to have another officer help carry Mr. Tsolkas. But in *Buckley*, the officer was alone and had called for backup, which had not yet arrived. Nor was there any evidence that the agency required certain measures under the circumstances of that arrest. Here, the record evidence shows that another officer was several feet from Deputy Sumner during the arrest and that agency policy dictated that Deputy Sumner seek assistance in transporting Mr. Tsolkas because he refused to walk. As the *Buckley* court and others hold, the only test is whether the officer was reasonable. 292 F. App'x at 796. Given the circumstances and agency procedures, the conduct was unreasonable. Further, like Mr. Tsolkas stated in his deposition, "if [he] would have tripped and fallen down and bumped [his] head, then, no, [he] wouldn't be here […] in a lawsuit against [Deputy] Sumner, but that's not what happened." [ECF No. 26-1 at 70:5-8]. But Deputy Sumner pushed Mr. Tsolkas to the ground, injuring him when he was not even supposed to be carrying him in the first instance. That is not a reasonable measure under the circumstances.[2]

---

[2] Deputy Sumner also relies on a Ninth Circuit case to suggest that pain compliance techniques are acceptable in moving passively resisting protestors, like Mr. Tsolkas. [ECF No. 23 at 16 (citing *Forrester v. City of San Diego*, 25 F.3d 804, 805 (9th Cir. 1994)]. But in *Forrester*, the agency's policies permitted such techniques, as well as dragging and carrying protestors. Thus, such force was reasonable *for those officers*. Here, on the other hand, BCSO policy required Deputy Sumner to seek assistance to carry Mr. Tsolkas during a civil disturbance. He violated that policy.

## II. A reasonable jury could conclude that Deputy Sumner acted because of Mr. Tsolkas's protected First Amendment speech in violation of clearly established law.

To state a claim for First Amendment retaliation, Mr. Tsolkas must show that (1) his speech was constitutionally protected, (2) Deputy Sumner's retaliatory conduct adversely affected the protected speech, and (3) there is a causal connection between the retaliatory actions and the adverse effect on speech. *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005). Retaliatory conduct adversely affects protected speech if the conduct "would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Id.* at 1254; *see also Khoury v. Miami-Dade Cnty. Sch. Bd.*, 4 F.4th 1118, 1129 (11th Cir. 2021). Mr. Tsolkas satisfies these elements.

First, it has long been clearly established that citizens can criticize police officers. The First Amendment protects "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest." *Carr v. Cadeau*, 658 F. App'x 485, 489 (11th Cir. 2016) (quoting *City of Houston, Tex. v. Hill*, 482 U.S. 451, 462–63, 107 S.Ct. 2502, 2510, 96 L.Ed.2d 398 (1987)). As the Supreme Court noted in *Hill*, the First Amendment

> protects a significant amount of verbal criticism and challenge directed at police officers. Speech is often provocative and challenging. But it is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest.

482 U.S. at 461. There is no question that challenging Deputy Sumner for doing another agency's "dirty work" or calling him a "fucking pig," and so forth, is protected speech. Moreover, Deputy Sumner concedes that such speech is protected and merely questions Mr. Tsolkas's ability "to connect his injury to his engaging in protected speech." [ECF No. 23 at 19].

Next, Mr. Tsolkas can satisfy the requirement that Deputy Sumner both engaged in retaliatory conduct and that it was the kind of conduct that would deter a person of ordinary firmness from exercising their First Amendment rights. *See, e.g.*, *Khoury*, 4 F.4th at 1129–30 (suffering a dislocated elbow while being detained would satisfy this requirement).

And finally, Mr. Tsolkas can demonstrate the but-for causal connection, when crediting his version of events. According to him, Deputy Sumner arrested and pushed him to the ground because of his speech. (Because of the *Heck* bar, Mr. Tsolkas only attacks the retaliatory motivation in the shove to the ground, not the arrest.) In *Khoury*, the Eleventh Circuit—accepting a dispute about the circumstances of the arrest and motivation for the officer twisting the arrestee's arm and detaining her—determined that it must credit the nonmovant's theory that those adverse actions occurred because of the arrestee's First Amendment activity (filming the scene). *Khoury*, 4 F.4th at 1130 (clearly established that a person has the right to be free from First Amendment retaliation). Here too, the Court should accept Mr. Tsolkas's version of events for the reasons explained above and permit a jury to determine whose theory of events is more credible—

18

that Mr. Tsolkas fell,[3] and Deputy Sumner followed him, or that Deputy Sumner pushed Mr. Tsolkas to the ground because he called the officer a "fucking pig" and refused to walk seconds earlier. *See id.* (reversing summary judgment because of genuine dispute of material fact as to whether the was a causal connection between the speech and alleged retaliatory action).

### III. Deputy Sumner is not entitled to sovereign immunity.

Under Florida law, an officer is immune from tort liability unless they act in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard of human rights or safety. *Coleman v. Hillsborough County*, 41 F.4th 1319, 1325 (11th Cir. 2022). The first two categories are synonymous and require actual malice. *Id*. The third category requires conduct "much more reprehensible and unacceptable than mere intentional conduct." *Id*. (cleaned up). "[W]hether an act was committed with malicious purpose, bad faith, or with wanton and willful disregard [to preclude immunity] is not a question that must be submitted to a jury, but rather, can be decided by the Court depending on the facts." *Blue v. Miami-Dade Cnty.*, 2011 WL 2447699, at *2 (S.D. Fla. June 15, 2011) (citing *Prieto v. Malgor*, 361 F.3d 1313, 1320 (11th Cir. 2004)). In resolving such facts, "the Court must view all facts in the record in the light most favorable to the Plaintiff." *Moore v. Eger*, 2017 WL 6367598, at *6 (M.D. Fla. Oct. 20,

---

[3] Deputy Sumner suggests that Mr. Tsolkas surprised Deputy Sumner by suddenly going limp. [ECF No. 23 at 19]. This assertion is contradicted by the video and Mr. Tsolkas's testimony, in which he stated that he went limp and fell to his knees and remained limp, which would not have been a surprise to Deputy Sumner. [ECF No. 26-1 at 37:21–39:12, 83:2–86:22, 88:25–89:3].

19

2017), *aff'd in part*, *appeal dismissed in part* sub nom. *Moore v. Sheriff of Seminole Cnty.*, 748 F. App'x 229 (11th Cir. 2018) (citation omitted).

Here, Deputy Sumner concedes that Mr. Tsolkas could establish a battery under Florida law if he satisfies his Fourth Amendment claim because those claims are assessed under a "similar standard." [ECF No. 23 at 20–21]. Crediting Mr. Tsolkas's and eyewitnesses' version of events, Mr. Tsolkas can satisfy his battery claim. As to Deputy Sumner's invocation of sovereign immunity, it must fail because the record evidence demonstrates, when crediting Mr. Tsolkas, that Deputy Sumner pushed Mr. Tsolkas to the ground because of Mr. Tsolkas's protected speech, or at least a reasonable jury could so conclude.

## IV.   Conclusion

For all these reasons, Mr. Tsolkas's claims should be resolved by a jury.

Dated: January 2, 2025

Respectfully submitted,

*/s/ James M. Slater*
James M. Slater (FBN 111779)
Slater Legal PLLC
2296 Henderson Mill Rd NE #116
Atlanta, Georgia 30345
james@slater.legal
Tel. (305) 523-9023

Joshua Tarjan (FBN 107092)
The Tarjan Law Firm P.A.
12372 SW 82 Avenue
Pinecrest, Florida 33156
josh@tarjanlawfirm.com
Tel. (305) 423-8747

*Attorneys for Plaintiff Peter Tsolkas*